UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


BIG BABOON CORPORATION,         ) CASE NO:  CV 09-1198-SVW(SSx)
                                )
               Plaintiff,       )              CIVIL
                                )
        vs.                     )    Los Angeles, California
                                )
DELL, INC, ET AL,               )    Tuesday, June 22, 2010
                                )
_____Defendants.____) (10:14 a.m. to 11:16 a.m.)


HEARING RE (1) MOTION TO COMPEL ADEQUATE INFRINGEMENT
CONTENTIONS CLAIMS CHARTS FROM PLAINTIFF
IN RESPONSE TO AMAZON'S INTERROGATORY NO. 2;
AND (2) EX PARTE APPLICATION TO COMPEL, ETC.

BEFORE THE HONORABLE SUZANNE H. SEGAL,
UNITED STATES MAGISTRATE JUDGE


Appearances:            See next page

Court Reporter:         Recorded; CourtSmart

Courtroom Deputy:       Denise Lazo

Transcribed by:         Exceptional Reporting Services, Inc.
                        14493 S. Padre Island Drive
                        Suite A-400
                        Corpus Christi, TX 78418-5940
                        361 949-2988


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

<u>APPEARANCES FOR:</u>


Plaintiff:                    SIDFORD LEWIS BROWN, ESQ.
                              CHRISTOPHER A. MATHEWS, ESQ.
                              Quinn Emanuel, et al.
                              865 S. Figueroa Street
                              10th Floor
                              Los Angeles, CA 90017

Defendants:                   PATRICK M. MALONEY, ESQ.
                              Baute & Tidus
                              777 S. Figueroa Street
                              Suite 4900
                              Los Angeles, CA 90017

                              MITRA M. ESKANDARI-AZARI, ESQ.
                              Alston & Bird
                              333 S. Hope Street
                              Suite 1600
                              Los Angeles, CA 90071

                              MASHHOOD RASSAM, ESQ.
                              DARREN E. DONNELLY, ESQ.
                              Fenwick & West
                              Silicon Valley Center
                              801 California Street
                              Mountain View, CA 94041

                              MARK J. SHEAN, ESQ.
                              Orrick Herrington & Sutcliffe
                              4 Park Plaza
                              Suite 1600
                              Irvine, CA 92614

3

1    **Los Angeles, California; Tuesday, June 22, 2010; 10:14 a.m.**

2    **(Call to Order)**

3    **THE CLERK:**  -- Court is now in session.  The

4    Honorable Suzanne H. Segal, United States Magistrate Judge,

5    presiding.

6    Calling Case Number CV 09-1198-SVW(SSx), *Big Baboon*

7    *Incorporated versus Dell, Incorporated, et al.*  Counsel, please

8    state your appearances for the record.

9    **MR. BROWN:**  Sidford Brown from Quinn Emanuel for

10   Plaintiff, Big Baboon, Inc.

11   **THE COURT:**  Good morning.

12   **MR. MATHEWS:**  Good morning, Your Honor.  Chris

13   Mathews from Quinn Emanuel, also for Plaintiff.

14   **THE COURT:**  Good morning.

15   **MR. RASSAM:**  Good morning, Your Honor.  Mashood

16   Rassam from Fenwick and West, for Defendant Amazon.Com Inc.

17   **THE COURT:**  Good morning.

18   **MR. DONNELLY:**  Good morning, Your Honor.  Darren

19   Donnelly also for Defendant, Amazon.com.

20   **THE COURT:**  Good morning.  So we're here today, first

21   of all, on Amazon's motion to compel and I have some questions

22   for Counsel.  And this is for Plaintiff's Counsel initially.

23   So one of the things I couldn't tell from reading the papers

24   was why the expert had only been there twice and what he needs

25   to do in order to -- fully understand their source code and

4

1    from the developing contention.  So maybe you can answer that

2    question for me.

3              **MR. BROWN:**  Shall I assume the --

4              **THE COURT:**  Sure.

5              **MR. BROWN:**  Your Honor, the expert went up there to

6    look at the source code to see what they had produced and what

7    we could do with it.  After looking at it, he determined that

8    there was additional information that he needed in order to be

9    able to match up the infringement contingents to the Amazon

10   system.

11             **THE COURT:**  And what additional information was that?

12             **MR. BROWN:**  So the basic information that is missing

13   includes the system level documentation.  The system level

14   schema and workflow that describe the systems.  The systems

15   that we've accused, for example, checkout by Amazon, is

16   composed of lots of subsystems that perform particular

17   functions, functions relating to identity of customers,

18   payments, various things, and each one of those subsystems

19   itself is composed of computer programs.  Some array of

20   computer programs that perform particular routines or

21   subroutines and that sort of treaty of stuff goes all the way

22   down to data that are stored in databases and themselves have

23   some structure that relates to the way these programs use the

24   data.

25             And to match up the functionality that is in the

1    claim limitations that we need to match to their accused

2    systems, we need to be able to know where to look.  We need the

3    map that these schema and high-level workflow documents would

4    provide so that when we're looking for some particular

5    functionality, we can look so we're looking at some function

6    within checkout by Amazon, we know which subsystem to look at

7    and then that will tell us what programs to go look for, and

8    that will tell us what routines are used by those programs and

9    it will tell us what databases are underlying that whole

10   system.

11           **THE COURT:**  So when did your expert decide he needed

12   that documentation to understand their systems?

13           **MR. BROWN:**  He decided he needed that documentation

14   the first day that we went out to look at their source code and

15   saw that it wasn't there.

16           **THE COURT:**  So that was in April?

17           **MR. BROWN:**  I believe it was in April.

18           **THE COURT:**  Okay.  So in April he decides he needs

19   the additional documentation.  What happened next?  Did you

20   make a request to Amazon?

21           **MR. BROWN:**  We have had correspondence with Amazon

22   asking for this additional information.  It was already within

23   the request that we had made to Amazon.  And we had a discovery

24   meeting last week with Amazon, pursuant to a notice we gave

25   them that we wanted to go forward on a motion to compel those

1    among other documents and I asked --

2         THE COURT:  I guess what I'm curious about is, when I

3    read the papers, it seemed that Big Baboon was complaining

4    mostly about an encyclopedia that they claim that Amazon has

5    that helps Amazon's programmers understand this better?

6         MR. BROWN:  No, Your Honor, that's not most --

7         THE COURT:  The Omnigroke (phonetic) or something

8    like that?

9         MR. BROWN:  Well, Omnigrok (phonetic) is one of --

10   it's just an example of a specific thing that was missing in

11   the sense of code that wasn't missing that we used to

12   illustrate the fact that their production of code, even as

13   underlying code, was incomplete and something that we believe

14   should have been included in their production.

15        THE COURT:  I thought it was just a search tool?

16        MR. BROWN:  Well, it is -- it's a matter of

17   characterization, whether you say it's just a search tool.

18   Amazon listed in their index of important things that they

19   provide to programmers as something that will show the entire

20   history of a bit of code.  It will show where a variable was

21   originally defined, where else it's used, just the genesis of

22   this program -- of some artifact that you find in the program.

23   And this system, as you can imagine, with 60,000 different

24   files, you need maps and you need direction as to where to go

25   to look for things.  So the focus of what we need in order to

```
 1    move forward are the things that we identified for them in a
 2    letter we sent them a couple of weeks ago, proposing a way to
 3    go forward and outlining what we thought they should provide to
 4    us as a predicate to our being able to move forward with a more
 5    detailed analysis of the infringement issues.  And --
 6         THE COURT:  Beyond the system level documentation,
 7    that's your term, what else -- is there anything else that you
 8    need to further flesh out the contentions?  Are there other
 9    documents you've asked for?
10         MR. BROWN:  We'd like this Omnigrok document for one
11    thing.  Another thing we need is, we want a 30(b)(6) witness
12    from Amazon who can answer particular questions about the
13    structure and completeness and nature of the programs.  We've
14    also asked Amazon to provide all of the code in an environment
15    where our experts can actually operate the programs to see --
16         THE COURT:  What does that mean exactly?
17         MR. BROWN:  Well, you can provide the programming
18    language just as a text file and you can read it and see what
19    each one of the instructions is, whereas the normal way to
20    produce code when you're trying to figure out what it does is
21    to produce it so you can both read it and run it.  You can
22    actually say, you know, run this program and you can put a set
23    of variables in and get a result out, and they've declined to
24    do that.
25         THE COURT:  Did they give you a reason why they
```

1    declined to do it?

2          MR. BROWN:  Well, I -- I'll let them answer it, but

3    as I understood it, they just said it wasn't necessary.  Why --

4    Omnigrok, they just said it wasn't necessary.  I think that

5    generally has been their answer with regard to all the

6    additional things that we've asked for.  The --

7          THE COURT:  So when you say "run it in an

8    environment" but you don't mean -- you mean that still -- I

9    understand some of the difficulty was the protective order

10   restrictions and having to review their source code in a

11   confined sort of atmosphere in the lawyers' office.  And there

12   was something in your papers about that, it's in Mountain View,

13   it's inconvenient, right?

14         MR. BROWN:  Well, that's just pursuant to the

15   protective order.

16         THE COURT:  Okay.

17         MR. BROWN:  Yes, it's inconvenient.  We weren't --

18   that's not a key point here.  I mean, that is what it is under

19   the protective order.

20         THE COURT:  Okay.

21         MR. BROWN:  And we're not saying that they've imposed

22   anymore onerous circumstances for the review --

23         THE COURT:  So if they're running it in an

24   environment that would be helpful to you, that could happen

25   also in the Mountain View office?

1          MR. BROWN:   Absolutely.

2          THE COURT:   It has to do with what they provide you?

3          MR. BROWN:   Absolutely.

4          THE COURT:   Okay.

5          MR. BROWN:   The -- we had a meeting with them last

6    Friday where we were talking about the documents that we wanted

7    Amazon to produce and are trying to avoid the need to file an

8    additional motion to compel them to produce documents.  One of

9    the categories of documents that were at issue there were these

10   high level workflow and schema that provide the map --

11          THE COURT:   The system level documentation?

12          MR. BROWN:   -- of the system.  The system level

13   documentation.  And they said that it had not been produced and

14   that they were presently gathering it for production and that

15   they would produce it.  And I'd be happy to read the part of

16   the transcript from that --

17          THE COURT:   Well, I take your word for it that

18   they're going to produce it and --

19          MR. BROWN:   Okay.

20          THE COURT:   -- what date was that meet and confer?

21          MR. BROWN:   It was Friday of last week, I believe it

22   was the 18th.

23          THE COURT:   Okay.

24          MR. BROWN:   And, Your Honor, that basically is the

25   starting point for an analysis of the code.

1            **THE COURT:**  Okay.  I have some more questions,

2  though.

3            **MR. BROWN:**  I'm sorry.

4            **THE COURT:**  That's all right.  I want to know also

5  the -- Amazon made an issue over the fact that, I guess, there

6  were originally 50 claims against Amazon and that the

7  infringement contentions relate to 10 of the 50 claims.

8            **MR. BROWN:**  Well --

9            **THE COURT:**  Is there some explanation for that?

10            **MR. BROWN:**  I think that the explanation is that when

11  we initially gave them our preliminary claims charts based on

12  the public information that we had, we gave them for all 50

13  claims.  And my understanding of their contention is that when

14  we gave them additional detail, that we didn't give them the

15  additional detail for some of those claims.  And I think the

16  explanation for that is that when we agreed to supplement those

17  initial claims charts, it was again trying to negotiate a

18  resolution with the Defendants who were claiming that we had

19  not given them enough to guide their document production.

20            And so while we weren't willing to go through the

21  exercise of trying to update all of the claim charts at that

22  time, to try to resolve that issue with them, we agreed to

23  provided them additional guidance for their document

24  production.  And so we gave them additional detail on what we

25  thought were representative subset of the claims that would

1    cover that issue, namely the scope of their document

2    production.

3         **THE COURT:**  Okay.  I understand that now.  Let me ask

4    you this.  Beyond the Omnigrok and the system level production,

5    were there other documents that were part of your recent meet

6    and confer?

7         **MR. BROWN:**  Well, there were.  The -- when we did

8    spend a couple of days looking at the source code we found some

9    things that suggested to us that it wasn't complete.  And the -

10   - so we identified some particular programs that were called by

11   import instructions within the programs that they had produced,

12   so that to run this routine it would call up another routine

13   and need that in order to run.  And so we found the name of

14   that program and searched it and it wasn't in the setup files

15   they had given us.  We don't know that that is an important

16   program or that it matters in any particular way, but we did

17   regard that as an indication of the incompleteness of the

18   production and it made us worry about the prospect of trying to

19   piece this whole thing together when there was some indication

20   that it wasn't even complete.  We didn't even have all the

21   puzzle pieces, which just in like putting together a jigsaw

22   puzzle makes it very hard if you don't know that you've got

23   exactly the complete set of pieces.

24        **THE COURT:**  Okay.  So beyond that source code

25   information, the system level documentation and the Omnigrok,

12

```
 1   is there anything else?

 2          MR. BROWN:  Well, we'd like to go forward with the

 3   30(b)(6) deposition that we --

 4          THE COURT:  30(b)(6) --

 5          MR. BROWN:  -- we've noticed.

 6          THE COURT:  And beyond that, is there anything else?

 7          MR. BROWN:  I think that is what we know we need.

 8   Obviously when we get these high level, system level

 9   documentation it's entirely possible that they'll point out

10   something that's missing, but that is the basic set of stuff

11   that our expert has told us we need in order to go forward with

12   this in a plausible way.

13          THE COURT:  So let's say you get all of that within

14   the next two weeks.  How much time would your expert need to

15   digest it, understand it, synthesize it?

16          MR. BROWN:  And I -- I don't know how to answer that

17   without seeing the stuff first.  I don't know how --

18          THE COURT:  Well, you should try and give me an

19   answer.  What would be a reasonable amount of time for you?

20          MR. BROWN:  Well, a reasonable amount of time to

21   provide additional infringement contentions?

22          THE COURT:  Yes.  Well, after they -- assuming

23   they've produced everything you've just asked for.

24          MR. BROWN:  Okay.  My -- this is a very complicated

25   system.  There are 60,000 source codes files they've produced.
```

1    It does take additional time because of where they're being

2    produced.   In the *DSC* case the Defendants have been pointing to

3    so consistently, the expert spent hundreds of hours over a

4    period of 11 months in going through the source code.

5             **THE COURT:**  Although Judge Nakazato wasn't very happy

6    about that.

7             **MR. BROWN:**   And the Judge wasn't very happy about

8    that.   And I'm sure I've got a smarter expert, but it's going

9    to take some substantial period of time.   I expect it will take

10   at least six months to do that.   And again, I'm hoping the

11   Court isn't going to hold me to this in some way that isn't

12   justified by any knowledge that I could have now.   Without

13   having the system level documentation, it's very hard for me to

14   commit to a particular time.

15            **THE COURT:**   I understand that and there's been some

16   of these issues raised in your opposition, but I thought one of

17   the things that was -- that I was looking for that wasn't there

18   was some explanation from your expert because, you know, I

19   trust what you're saying, but it tends to be -- to some degree

20   it's argument and I don't have facts from your expert saying

21   this is how I've approached it, this is how much time it's

22   taken me to do this, this is how much time I anticipate doing

23   this in the future.   You know, all I have is your generalized

24   contentions that you need more time.   And I trust that you're -

25   - you believe that, but I don't have anything in the form of a

1   declaration from your expert showing that to me.

2       **MR. BROWN:**  I understand, Your Honor.  And I think

3   it's perfectly reasonable for Your Honor to be looking for

4   that.  Maybe a way to go forward with this is, after we have

5   that system level documentation and the deposition from Amazon,

6   we could provide the expert's evaluation as to how much time

7   would be needed in order to accomplish this.

8       **THE COURT:**  Well, you kind of were on notice when

9   they brought the motion to compel that this was going to be the

10  issue before the Court today.  So, you know, my goal is to try

11  and help the parties resolve this in a way that meets your

12  needs and also meets the Defendants' needs.  So unless you have

13  something else to add to what you've already given me, I want

14  to hear from the Defendants now.

15      **MR. BROWN:**  Thank you, Your Honor.

16      **THE COURT:**  Okay.  So let me talk to Amazon about,

17  first of all, the request for these documents that they made to

18  you and whether or not you think you can produce them and so

19  forth.

20      **MR. RASSAM:**  Good morning, Your Honor.

21      **THE COURT:**  Good morning.

22      **MR. RASSAM:**  I think with respect to a lot of these

23  systems, they're just not relevant to understanding how the

24  accused systems function.  They have the source code, which

25  lays out how these systems function.

1          **THE COURT:**  Relevance is not always the strongest

2     objection in a discovery hearing.

3          **MR. RASSAM:**  That having been said, Your Honor,

4     Omnigrok is a search tool.  They have search tools available to

5     them, but if they absolutely think it's necessary that they

6     need Omnigrok to understand the systems, we will provide

7     Omnigrok.

8          **THE COURT:**  Okay.

9          **MR. RASSAM:**  As we said in the meet and confer, to

10    the extent that we have schemas, if they think those are

11    necessary, we will --

12          **THE COURT:**  Do you understand what they mean by that?

13          **MR. RASSAM:**  I would have to go back and talk to the

14    engineers.  My guess is --

15          **THE COURT:**  Some kind of map or --

16          **MR. RASSAM:**  My guess is they want to understand the

17    structure of the databases.

18          **THE COURT:**  Okay.

19          **MR. RASSAM:**  That is something that if their expert

20    had been diligently looking at the code, he could have

21    understood from the code, Your Honor.

22          **THE COURT:**  And why do you believe that?

23          **MR. RASSAM:**  Based on conversations we've had -- my

24    colleagues have had, and to some extent myself, with the Amazon

25    engineers, that they could understand how those databases work,

1  but they've not done that, Your Honor.

2         THE COURT:  Okay.  And the other information that he

3  wanted, source -- additional source code information.  Do you

4  understand what he's asking for there?

5         MR. RASSAM:  Yeah, Your Honor, what they've done

6  after looking at our code twice is they've pinpointed six files

7  of source code that they say they need.  Our contention is they

8  have everything they need at this point to see how our systems

9  work and to develop adequate infringement contentions, but to

10 the extent that they're going to make an issue out of those six

11 files, Your Honor, our goal has always been to move this case

12 forward and to get adequate infringement contentions.  So we

13 will make those six files available to them.

14        THE COURT:  By when?

15        MR. RASSAM:  I think we have received them from our

16 client and we can upload it to the computer that's available in

17 our offices fairly shortly.

18        THE COURT:  Okay.

19        MR. RASSAM:  So I don't think that would take too

20 much time.

21        THE COURT:  So let me ask you this question, what

22 about the 30(b)(6) deposition?

23        MR. RASSAM:  Well, Your Honor, that -- if I could

24 just -- for just a second more broadly frame this issue,

25 because I think the 30(6) -- 30(b)(6) deposition fits into

1    that.  What's been going on, from Amazon's perspective, is we

2    keep providing them with information that's going to help them.

3    We've given them all the information they need that's going to

4    help them get these contentions together and every time we give

5    them something, they set the bar a little bit higher and they

6    say well, now we need this, now we need this.  I'll give you an

7    example, when -- they ignored the source code for two months

8    after it was produced.  When they finally came and looked at

9    it, the only thing they mentioned to us was that they needed

10   Omnigrok.

11           **THE COURT:**  You know that -- this is -- that was well

12   presented in your papers, that theme, and I understand that is

13   the position of Amazon.

14           **MR. RASSAM:**  Right.

15           **THE COURT:**  So I'm not disagreeing with it, I'm just

16   saying it was adequately presented.

17           **MR. RASSAM:**  Okay.  So now the additional material

18   that they want, we first learned about that in their June 1st

19   letter and the source code has been available to them since

20   February 22nd.

21           **THE COURT:**  I guess what I need you to articulate for

22   me is -- and again, I think this is difficult to do without

23   actual expert support, but why it would be Amazon's contention

24   that based -- simply on what you've produced so far and these

25   additional documents, they should be able to provide you with

18

1    pinpoint citations to the source code and additional detail in

2    their infringement contentions without a 30(b)(6), because it's

3    his position that he can't understand everything you've

4    produced to him without deposing your 30(b)(6) witness.

5           **MR. RASSAM:**  Right.

6           **THE COURT:**  So why is that unnecessary?

7           **MR. RASSAM:**  Because, Your Honor, an expert can read

8    source code.  That's why we have experts.  And we always --

9    Amazon has done a number of these cases.  We provide source

10   code in text file format, that's just the way it happens in the

11   ordinary course of litigation.  And if you bring in an expert

12   who can sit there and diligently review that source code,

13   they're going to be able to figure that out.  There's not going

14   to be a need for a 30(b)(6) deposition.

15          And, Your Honor, here's the concern with a 30(b)(6)

16   deposition.  We had a meet and confer for this motion on May

17   4th of this year.  They said at that point that they needed to

18   take depositions to figure out how things were going to go and

19   I think the -- that transcript is Exhibit 1 to our motion -- to

20   my declaration of that motion and we said go ahead and notice

21   your depositions.  And now they've noticed it on June 21st, so

22   they waited all that time.  And so it just becomes a game of

23   delay, Your Honor.

24          If they had -- you know, they should have noticed

25   that deposition, because it's not -- it's just the deposition

1   of Amazon, it's a 30(b)(6) depo, why didn't they notice that on

2   May 5th so that we could have gotten that deposition and moved

3   forward?  What we can do now, Your Honor, is they can provide

4   us with what they have now, with the tens of thousands of pages

5   of documents, and the source code, they can provide us with a

6   comprehensible set of infringement contentions that actually

7   maps claims elements to the systems and they can do it for

8   every single claim, which they haven't done to date.  Of

9   course, you know, we will work with them to get them a 30(b)(6)

10  witness, and at that point as they get more discovery together,

11  then they can put that discovery towards providing us with a

12  supplemental or final set of infringement contentions, which

13  can -- using any new discovery that they have received,

14  complete whatever may have been complete in the set they give

15  us, or for whatever reason perhaps it was inaccurate.

16          **THE COURT:**  Let me ask you this question.  If you

17  provided them with the additional documentation that they've

18  asked for here today and not the 30(b)(6) deposition, how long

19  do you think would be reasonable for their expert to review

20  what you've given them and provide more detailed contentions?

21  How much time?

22          **MR. RASSAM:**  Well, Your Honor, at that point I think

23  their expert should come up to our offices in Mountain View,

24  and they should send as many code readers or experts as

25  necessary, and --

1          THE COURT:  I understand that, but from today --

2          MR. RASSAM:  -- hopefully --

3          THE COURT:  -- let's say they start in this process

4    and their experts -- or their expert readers are engaged and

5    they diligently pursue this information that you've provided.

6    How long would it take an expert to synthesize what you've

7    given them and produce more detailed contentions?

8          MR. RASSAM:  Given the fact that they've already had

9    plenty of opportunity to look at the stuff that's already been

10   provided, with the new material, hopefully in two weeks, in 14

11   days, they can get something together.  Maybe a little bit

12   longer, but Your Honor, six months is -- it's extraordinary for

13   them to say six months.

14          Your Honor, we were here earlier in this courtroom

15   because they said that they needed to understand Defendants'

16   invalidity contentions early in the case and Defendants

17   provided those contentions in March -- on March 23rd.  And

18   those contentions have pinpoint citations to the documents that

19   are at issue and they map claim elements.  In this case -- but,

20   Your Honor, now we have to wait six months from today?  That's

21   going to put us near 2011 for us.

22          THE COURT:  Can I ask you whether the Plaintiff has

23   provided these types of contentions for any other Defendant in

24   the case?

25          MR. RASSAM:  My understanding, Your Honor -- I don't

21

 1  keep up with everything that happens with every Defendant --

 2            THE COURT:  Okay.

 3            MR. RASSAM:  -- is that most Defendants have what

 4  resemble the third set of contentions that we have, which is to

 5  say that they've asserted 50 claims against us.  That third set

 6  of contentions only covers 15 of them.  So the vast majority of

 7  claims are missing.  And I think with us, as with other

 8  Defendants, most of the allegations -- many of the allegations

 9  are made on information and belief, Your Honor.  You're

10  supposed to try to infer how you infringe based on the

11  contentions.

12            THE COURT:  So as to the other Defendants, do they

13  have the same number of claims against them?  Everyone in the

14  same ballpark or --

15            MR. RASSAM:  I don't know precise numbers, Your

16  Honor, but if my recollection serves me correctly --

17            THE COURT:  About the same?

18            MR. RASSAM:  -- I do believe it's 40 or 50 or 60

19  claims.

20            THE COURT:  Each Defendant?

21            MR. RASSAM:  Yes.  We're not unique in that

22  circumstance, Your Honor.

23            THE COURT:  Okay.  Great, thank you.  Did you want to

24  respond to any of that, Mr. Brown?

25            MR. BROWN:  I do want to respond to a few points.

1          The first point is, when you asked Mr. Rassam whether

2  they had or understood or knew what the high level documents we

3  were asking for were, and he indicated, I think, that they were

4  uncertain as to whether those documents existed.  And I'd just

5  like to read what actually he said at the meet and confer.  So

6  at the meet and confer I asked,

7          "The second class of documents that we think Amazon

8           should have provided are schema for the databases

9           used in the alleged systems and system level

10          documentation, workflows and schema for the accused

11          systems.  So far as we have seen in the documents

12          that have been produced, these documents have not

13          been produced; is that right?"

14      To which Mr. Rassam responded,

15          "So the first thing that I would say about that is

16          that I think that from the code that we have

17          produced, you can glean the database structure that I

18          think you are looking for."

19      And I asked, "But you haven't produced schema for

20  these databases; is that right?"  To which Mr. Rassam replied,

21  "Not independently of the code, no."  And I asked, "And so,

22  what is the reason for Amazon not producing these schema and

23  system level workflow?"  And Mr. Martin, another one of

24  Amazon's attorneys replied, "We're in the process of collecting

25  them."  And I asked, "Those are going to be produced; is that

1   right?"  To which Mr. Martin replied, "Yes, they are."

2          They weren't confused about what those documents were

3   or whether they existed.  They said they were collecting them

4   for production.  Mr. Rassam says that the normal thing is to

5   produce code as text files and that's why they haven't produced

6   them in an operable environment.  The very case that they rely

7   so much on, the *DSC* case, notes that the expert had had the

8   source code in an environment where the code could be run for

9   more than 11 months.  So again, on this sort of sampling of

10  information that we have, operable files are the norm.

11          And Mr. Rassam has provided absolutely no basis for

12  suggesting that any expert in the world could look at this

13  collection of 60,000 source code files, especially without any

14  system level documentation, and do anything with them that

15  could be meaningful in 14 days or 30 days or 60 days or any

16  other particular time period.  The -- if Your Honor is

17  interested in knowing what this source code looks like, I have

18  brought a small sample of some of the pages that we have

19  printed out that I could show you to give you an idea of how

20  inscrutable this code is.  It's not something that you can look

21  at 60,000 files of and just start piecing together in some

22  finite amount of time.  That's why we need the high level

23  documents, so we know where to look, we know which systems to

24  look in and we know which files relate to which systems and

25  which systems relate to which databases.  We can't start until

24

```
1    we have that.  That's the problem with the point they keep

2    making, that we've had access to what we've had access to for

3    several months.  It's not the starting point.  We can deal with

4    that after we have this additional stuff.

5            THE COURT:  Thank you.  I have another question for

6    Amazon.  Plaintiff raises this point about an environment for

7    running.  Do you have a problem providing that?

8            MR. RASSAM:  Well, Your Honor, we think that they

9    have what they need to figure out how our systems function.

10   And the problem -- there's several problems when they say need

11   in an operable environment.

12           First, it would have been very helpful to us had

13   Norman Jacobsen (phonetic), their expert who's reading this

14   code, provided a declaration that said, you know, here is the

15   claim element and here is why I can't figure it out because I

16   needed -- I need to execute the system.

17           THE COURT:  I guess maybe I didn't phrase my question

18   narrowly enough.  Is there a reason, a privilege or something

19   else, why Amazon has not provided it an environment in which

20   they could run the source code?

21           MR. RASSAM:  Your Honor, my understanding is, from

22   talking to my colleagues who speak with Amazon engineers, is

23   that it would be extremely difficult to do that.

24           THE COURT:  Why?

25           MR. RASSAM:  Well, because at some point, if you're
```

1   trying to execute these files, you may end up having to go

2   broader and broader and encompass much of the Amazon.com

3   website, and at that point it just becomes oppressive, whereas

4   here what they have is the text files that they can just read.

5   You know, what I would like to hear from them, Your Honor, is a

6   reason why they need it in an operable environment.

7           **THE COURT:**  Uh-huh.

8           **MR. RASSAM:**  You know, we have a stipulated

9   protective order in this case that sets out in exhaustive

10  detail how source code should be produced.  During those

11  negotiations, not once did they say in order for us to

12  understand the source code it is absolutely necessary that we

13  get it in an executable environment.  But now we hear this --

14  all of a sudden we hear this in late April, two months after

15  the source code has been produced.  So it's just -- it's a

16  matter of -- you know, they have an expert who can read this

17  code and if he sat there since the day it was produced, he

18  could have read it.  This operable system argument just seems

19  like a red heron to delay things even further.

20          **THE COURT:**  Okay.  All right, thank you.

21          Okay.  So the Court's going to issue a more

22  comprehensive ruling, but now I'll tell you the Court's ruling

23  in short now, is to grant the motion in part and deny it in

24  part.  I'm ordering the parties, Amazon and BBC, to meet and

25  confer within seven days and arrange file protocol for

1    exchanging the information that has been requested from Amazon.

2    All the documentation that has been discussed today, I'm

3    ordering produced, although not the latter, not -- I'm not

4    requiring production of the source code in an environment that

5    makes it runnable, as requested by the Plaintiff, nor am I

6    ordering the 30(b)(6) deposition to proceed.  So -- but the

7    documentation that they've requested has to be discussed and I

8    require -- I'm going to order the production of all information

9    -- all additional information within 14 days from today's date.

10           The parties shall also discuss a schedule for Big

11   Baboon's expert to review more source code information.  This

12   should be done diligently and with a focus on an expeditious

13   review of that information.  I would expect the expert to make

14   himself available or make assistants of the expert available to

15   pursue this diligently.  I find that Big Baboon has not pursued

16   the review of that source code information as diligently as the

17   Court would have expected.  I'm going to order more detailed

18   infringement contentions with cites -- pinpoint citations to

19   source code within 60 days of today's date.

20           There will be a more detailed order issued by the

21   Court that will put that in writing, but for now you know what

22   the Court's ruling is, okay?  Anything further from the

23   parties?

24           All right.  I'd like to hear the next -- the ex parte

25   application.  Thank you.

1          **MR. RASSAM:**  Thank you, Your Honor.

2          **MR. BROWN:**  Thank you.

3          **THE COURT:**  Thank you.  Good morning.

4          **MS. ESKANDARI-AZARI:**  Good morning, Your Honor.

5    Mitra Eskandari-Azari for Defendants, Dell and UPS.

6          **THE COURT:**  And you want to state your appearance

7    again?

8          **MR. BROWN:**  Sidford Brown of Quinn Emanuel for Big

9    Baboon.

10          **THE COURT:**  Good morning.  So this is Defendant's ex

11   parte application to compel third-party testimony over

12   privilege objections.  Let me just say that Big Baboon was

13   correct to object on the grounds that the Court strongly

14   disfavors ex parte applications.  Normally, I would have denied

15   this outright because there was no meet and confer.  There's a

16   very, very high standard of an ex parte application of a matter

17   of urgency and requiring expeditious review, and I find that

18   Defendants have satisfied that in the sense that depositions

19   are scheduled to proceed very, very soon or were scheduled to

20   proceed, and therefore the parties require some clarification

21   on what the Court's opinion would be on this issue.

22          On the other hand, the issue is more complex than an

23   ex parte application can adequately brief.  And, you know, I

24   don't feel that I've had enough time to review all the parties

25   arguments on this very issue in order to address the merits of

1    the ex parte.  And I had some questions for the parties and I

2    think my main question is, you know, who remains to be deposed

3    and are they also patent prosecution attorneys?

4              **MR. BROWN:**  Your Honor, there are four depositions

5    that I believe are scheduled -- or that were scheduled.  Two

6    were additional patent prosecution attorneys.  Those two have

7    essentially been taken off calendar until further scheduling.

8    There is a deposition, I believe it's scheduled for tomorrow,

9    of Mr. Stocker (phonetic), who is not a patent prosecution

10   attorney, and to the best of my knowledge, who never had any

11   conversations with any patent attorneys.  And his deposition,

12   although cited by Defendants as a grounds for filing this ex

13   parte, has absolutely nothing to do with any privilege issue.

14   He was some business consultant who worked with the Defendants

15   and never dealt with any of the lawyers to the best of my

16   knowledge.

17             **THE COURT:**  Okay.

18             **MR. BROWN:**  So --

19             **THE COURT:**  So let me ask you this question, Mr.

20   Brown.  This was the primary tension that I saw in the cases

21   that were cited and the discussion that you and Counsel had at

22   the time of the deposition.  It seems to be the -- the

23   disagreement -- I mean, first there is the *Spaulding* (phonetic)

24   case that basically says a conversation from a client with a

25   patent attorney in the course of the prosecution is a

1   confidential communication, right?

2          MR. BROWN:   Correct.

3          THE COURT:   Okay.  But it seemed like, in looking at

4   that case, you know, what the Court was mostly concerned about

5   was the communication between client and attorney, and that

6   subsequent cases have tried to, you know, sort of parse out

7   facts -- factual information that might not be part of that

8   confidential communication.  So is your position that, you

9   know, everything that the patent attorney does is confidential

10  or just the communications with the client?

11         MR. BROWN:   Well, the problem is that -- and the

12  cases have followed this, I think without exception, where

13  there is work that the patent attorney has done, or things that

14  he has said or conclusions that he has reached, that have their

15  original basis in communications from the client, those things

16  are privileged.  Those aren't facts, those are the results of

17  communications and they reflect communications, so --

18         THE COURT:   Well, I guess I see if they're

19  intertwined, like the underlying technical data.  If you're the

20  inventor and you have a meeting with your patent prosecution

21  attorney and you discuss the factual information relating to

22  your invention and, you know, in the course of asking his

23  opinion as to whether or not a patent would be appropriate or

24  something to that effect, that conversation and those facts

25  might be privileged, but the fact that you went to meet with

1    the lawyer is not privileged information.

2         **MR. BROWN:**  And we didn't assert the privilege as to

3    the existence of any meetings.  The reason that gets confused

4    is the Defendants asked the question, did you meet with so-and-

5    so on the subject matter of something or about something.  The

6    answer to that would be yes, I met with the client and

7    discussed this subject matter.  That's privileged.  There are

8    good cases that we cited.  I don't know any contrary authority.

9    The subject matter of the communications between attorney and

10   client are privileged.  They --

11        **THE COURT:**  But what if the question simply asked,

12   did you have a meeting with your lawyer?

13        **MR. BROWN:**  I never objected to her asking that

14   question.  And you'll see in our papers, I've put in lots of

15   examples where she asked all of those background questions and

16   I let the witness answer them without any objection or

17   instruction.

18        **THE COURT:**  Okay.  Let me hear from Counsel for Dell.

19   Do you agree with that?

20        **MS. ESKANDARI-AZARI:**  No, Your Honor, we don't agree

21   with that.  We actually think that Your Honor has it correct

22   with *Spaulding*, in the view that it is a communication when

23   transmitting that communication or those facts to the attorney

24   in patent prosecution context, that would be the

25   attorney/client privilege, not merely the facts themselves.

1          We attempted to get -- there are some instances where

2   we attempted to get factual background where Plaintiffs did

3   allow us to ask a few of those very factual, what, when, how,

4   who questions, but many examples that we cite in our papers

5   that clearly show that they blocked many of those on the same

6   attorney/client privilege.  They did not treat it consistently

7   throughout, which is essentially part of the problem and why

8   we're here, because the attorney/client privilege is being

9   viewed so broadly in some areas and not in others, so as to

10  prevent Defendants from truly sectioning out exactly where it

11  lies, to figure out if it's challengeable or not or if it's

12  proper.

13          **THE COURT:**  Okay.  So it's your position that you're

14  entitled to depose the patent attorney and you can ask

15  questions that are anything but his conversation with his

16  client, basically?

17          **MS. ESKANDARI-AZARI:**  We can ask questions -- we

18  believe that anything that involves a communication between the

19  client and the attorney certainly would fall -- or could

20  arguably fall on the attorney/client privilege, but facts about

21  the patent itself, such as the sections where, according to Mr.

22  Wong (phonetic), the client actually drafted those himself

23  without communicating with the client.  There are certain parts

24  of the patent, certain technical terms that Mr. Wong, in his

25  deposition, said I -- he said my attorney wrote that.  And if

32

1   we cannot ask the attorney -- if he's claiming -- if the

2   attorney is claiming privilege for that information about the

3   factual definition of that term, and we can't get it from Mr.

4   Wong, we're essentially blocked from discovering any of these

5   facts.

6          **THE COURT:**  Why couldn't Plaintiff's expert testify

7   about that?

8          **MS. ESKANDARI-AZARI:**  Because Plaintiff's expert

9   would not have the information as to what that was intended --

10  what that fact was intended to mean at the time in 1997 when it

11  was being written.  Plaintiff's expert would look at it today,

12  in today's view, and not be the person saying at the time this

13  was written, this is what it meant.

14         **THE COURT:**  Let me ask you this question.  What's

15  your position on the questions that related to individuals that

16  you were asking the attorney about questions about other

17  individuals, not Mr. Wong, but people who might have some kind

18  of relationship with Mr. Wong, and there were objections

19  asserted on attorney/client privilege grounds.

20         **MS. ESKANDARI-AZARI:**  Yes.  With those individuals,

21  the situation we ran into is that many of them are employees of

22  Mega Networks, which is a separate corporation entity from Mr.

23  Wong obviously.  The attorney/client privilege existed between

24  Mr. Wong and his attorney, Mr. Yuri (phonetic), and the other

25  patent prosecuting attorney that he worked with, but not

1  between the employees of Mega Networks and Mr. -- and the --

2  Mr. Yuri or any of the other patent prosecuting attorneys.

3           **THE COURT:**  Why wouldn't they be agents of Mr. Wong?

4           **MS. ESKANDARI-AZARI:**  Because they weren't employees

5  of Mr. Wong.  They weren't -- there was no evidence suggested

6  that they were acting at Mr. Wong's behest.  They were

7  employees of Mega Networks.

8           **THE COURT:**  How closely related is Mega Networks and

9  Big Baboon?

10          **MS. ESKANDARI-AZARI:**  I don't know the interworkings

11 of how closely related they are.

12          **THE COURT:**  Okay.  Thank you.  So, Mr. Brown, can you

13 answer that question?

14          **MR. BROWN:**  I can answer the question, but I'd also

15 like to provide a little additional information on the third-

16 party issue.

17          **THE COURT:**  Okay.

18          **MR. BROWN:**  First of all, Mega Networks was closely

19 related to Mr. Wong.  He owned and controlled the company, but

20 more importantly, we have not asserted that the privilege with

21 regard to conversations that the particular individuals other

22 than Mr. Wong had with Mr. Yuri, that the privilege was based

23 on or dependent upon the employment by Mega Networks.  That's

24 not the basis of the relationship.

25          The basis for the assertion is that they were acting

1   on behalf of Mr. Wong as his agents.  And we have cited law

2   showing that the attorney/client privilege extends to such

3   third-parties acting on behalf of a client and communicating

4   material to their attorney.  And they have cited no case to the

5   contrary.  The -- as far as any factual basis for those claims,

6   they were free to ask Mr. Wong as to whether people acted on

7   his behalf or at his behest and it's -- we think that the

8   assertion is completely proper.

9         **THE COURT:**  Okay.  Let me ask you about some specific

10  questions that I saw that I didn't understand really exactly

11  why it was that you were making the objection.  I'm looking at

12  Page 29 --

13        **MS. ESKANDARI-AZARI:**  I'm sorry, Your Honor, of

14  the --

15        **THE COURT:**  It's actually Page 31 -- it's

16  consecutively numbered of the deposition transcript, it's Page

17  29 of the actual transcript.  So in this question the lawyer

18  asks, "Are you familiar with Mega Networks?"  And the answer

19  is, "I'm familiar with that name, yes."  Then the question is,

20  "What does Mega Networks do?"  And you objected to the extent

21  that it will require the disclosure of any privileged

22  information, but you also instructed the witness not to answer.

23  And I didn't understand why that was objectionable.

24        **MR. BROWN:**  Well, the objection to what is Mega

25  Networks is that it's a question that would call for any

 1   privileged communication by Mr. Wong as to what Mega Networks

 2   was or what it did.

 3        **THE COURT:**  See, I don't see that as privileged

 4   communications.

 5        **MR. BROWN:**  If Mr. Wong tells his lawyer, Mega

 6   Networks is a company that I run that, for example, and I'm not

 7   saying this is the case, but that I run to develop software

 8   programs that I made and patent.  Or --

 9        **THE COURT:**  I don't see that as privileged

10   information.  And I also don't see the question necessarily

11   calling for that.  My problem with -- I think is some of your

12   objections were sound.  I went through the transcript, I agree

13   with some of them, but some of them were speculative in the

14   sense that the question itself didn't draw that answer.  It

15   would only draw that answer if the witness really went beyond

16   the question and then I don't think the objection is correct.

17        So, for example, with that particular one, what does

18   Mega Networks do, it doesn't draw privileged information.  It

19   just doesn't draw it, it just doesn't ask for it.  And it

20   doesn't relate to the inventor's record.  It's not about the

21   subject matter, you know, of this narrow -- of these patents.

22   So I just didn't see that as a proper objecting.

23        And then further down on Page 30 it says, "How did

24   you come to that understanding of Mega Networks?"  And you

25   instructed him not to answer and he declined to answer pursuant

1    to my Counsel's instruction.  And I think he could have said,

2    you know, I read about it on the internet.  You know, I mean

3    there were things he could have said that wouldn't have

4    necessarily disclosed privileged information.

5          **MR. BROWN:**  Well look, I can't claim that in every

6    instance my objections were perfect.  I tried, in response to

7    questions like that where I thought a possibility of privileged

8    information and a possibility of non-privileged information, to

9    state the objection in a way that it was clear that I was only

10    instructing him not to disclose privileged information, but

11    that he was free to disclose any non-privileged information.

12    My recollection is that the witness did say what he knew about

13    Mega Networks --

14          **THE COURT:**  He did.

15          **MR. BROWN:**  -- from public information.  And I think

16    -- if you look at the whole of the transcript, you'll see that

17    I tried pretty hard to be careful not to just give a blanket

18    instruction where there -- where I saw there was a probability

19    that he would have non-privileged information in addition to

20    privileged information.

21          **THE COURT:**  Uh-huh.

22          **MR. BROWN:**  So I don't -- I don't guarantee there

23    aren't instances where I didn't state that as completely as I

24    should have.  I disagree with the Court as to whether the

25    communication by Mr. Wong to the lawyer about his company's

1    privilege.  It's an attorney/client communication and I think

2    it's privileged.  The -- but as to the second point --

3            **THE COURT:**  Not everything that even -- that an

4    attorney says -- that a client says is necessarily privileged.

5    It has to be about a communication that they would anticipate

6    is confidential.

7            **MR. BROWN:**  Well --

8            **THE COURT:**  So if you say to your lawyer, let's meet

9    at noon for lunch, it's not a privileged communication.

10           **MR. BROWN:**  I understand, but what Mr. Wong would be

11   telling Mr. Yuri about his company would only be told to him

12   because Mr. Yuri was being engaged as an attorney to act for

13   Mr. Wong.  They weren't social friends, they weren't -- so I

14   don't mean to belabor that point.

15           **THE COURT:**  Okay.

16           **MR. BROWN:**  It's -- I'm just trying to explain why I

17   made that objection.

18           **THE COURT:**  Okay.  Okay, so here's what I -- thank

19   you.

20           With the ex parte, I'm going to deny the ex parte

21   because of the lack of meet and confer and because I don't find

22   that the issue has been adequately briefed for the Court.  I'm

23   not in a position to really direct the parties based on what's

24   before me.  I'm going to deny it without prejudice and allow

25   the parties to re-file it as a joint stipulation without

38

1   adequate briefing, and you can do it on an expedited schedule,

2   if you file an ex parte application with the joint stipulation

3   to do it on an expedited schedule.  And, you know, I would

4   encourage the parties to do a meet and confer as promptly as

5   possible and then -- and re-file it as a joint stipulation.

6          Having said that, if the parties meet and confer and

7   can come to some resolution of this issue without filing it as

8   a joint stipulation, I think that's obviously a more practical

9   and more expedited result.  And so I'm going to tell you what

10  my thoughts are.  These are my preliminary thoughts, they are

11  not my ruling on it, because I'm denying it because it wasn't

12  adequately briefed, but my preliminary review leads me to

13  believe that the witness has to require -- testify about

14  factual information that does not reveal confidential

15  communications.  And I realize that's difficult because

16  sometimes factual information can be intertwined with the

17  confidential communication, but that's the general rule that a

18  patent attorney must testify about facts that do not reveal

19  confidential communications.

20         And in order for the Plaintiff to assert the

21  privilege as to other individuals, third-parties, the Plaintiff

22  must show that the individual was an agent of Big Baboon before

23  asserting the privilege objection, that is I would expect to

24  see some explanation on the record, Mr.-Fill in the blank-

25  Schmidt, was an agent of Mr. Wong's because -- you know.  And

1  then therefore, he's entitled to the same privilege and we

2  object.

3         So I would caution the parties to instruct not to

4  respond in the very limited circumstance where you're convinced

5  that the nature of the question is going to call for a

6  confidential communication.  I draw a distinction between

7  making the objection and then making the objection and

8  instructing not to respond.  I think if you make the objection,

9  you preserve the objection and I understand there are concerns

10 about waiver but your client is a witness.  I mean, your

11 witness is a lawyer and should be able to recognize when the

12 question is going to call for privileged information.

13        So, there was a concern raised in the ex parte

14 application about the break in the middle of the deposition.

15 And that's something I wanted to kind of nip in the bud.  I

16 think each witness has to testify for seven hours.  And if

17 there's going to be a need for a break of some kind, that has

18 to be addressed in advance and stipulated to by the parties.

19 So, the witness doesn't -- I was disappointed to see that.  The

20 witness doesn't get to say when the deposing attorney shows up,

21 by the way, I've got a meeting at 12:30, can't be back until

22 2:30, got to leave at 6:00.  That's just not the way this is

23 going to work.  So, everybody gets seven hours with reasonable

24 breaks.  If there's some exception to that, the parties have to

25 stipulate around that and do it with a proposed order.  Okay?

40

1          So, I'm going to grant the ex parte to the extent

2     that Dell has requested an additional number of hours of Mr.

3     Yuri's deposition.  I'm granting them -- now, how much of the

4     deposition was completed?

5              **MR. BROWN:**  I think it was about five hours, Your

6     Honor.

7              **MS. ESKANDARI-AZARI:**  That's approximately what we

8     have as well.

9              **THE COURT:**  Okay.  And how much more time do you

10    believe you need of his deposition?

11             **MS. ESKANDARI-AZARI:**  In light of Your Honor's

12    thoughts on the attorney/client privilege context, we would

13    like to rehash some of the areas.  So, I'm -- we have asked for

14    an additional seven.  I think we can probably go for an

15    additional five, so that we can rehash those issues that

16    were --

17             **THE COURT:**  Okay.

18             **MS. ESKANDARI-AZARI:**  -- really not --

19             **THE COURT:**  I'm going to grant an additional five

20    hours of Mr. Yuri's deposition and the scheduling of that

21    should be discussed at the meet and confer between the parties.

22             And I would just caution the parties that my view on

23    conduct and objections in a deposition is, you know, I

24    recognize this is a case with a lot of money at stake and

25    tensions run high but I would urge you to be as professional

41

1    and gracious and thoughtful in your deposition conduct as

2    possible.  If one side has an objection that you're troubled

3    by, take five minutes.  Take a break and talk about it and try

4    to work it out instead of, you know, duking it out on the

5    record because it wasn't very efficient.

6            I'm not saying you could have resolved it but you

7    might have resolved it had you had a conversation about it and

8    in the transcript, the conversation between the lawyers when

9    this issue was first approached was not what I would have hoped

10   to have seen.  There wasn't really an effort at resolving it.

11           **MS. ESKANDARI-AZARI:**  Your Honor, in order to assist

12   with resolving this, we have two additional requests we'd like

13   to bring up at this time.

14           **THE COURT:**  Okay.

15           **MS. ESKANDARI-AZARI:**  We would like Your Honor to

16   consider modifying Her order regarding the discovery meet and

17   confers to request that lead counsel be in attendance at all

18   meet and confers.  We've found to-date that when lead counsel

19   is not present at the meet and confers, they are certainly less

20   effective.

21           **THE COURT:**  So, who is lead counsel?

22           **MS. ESKANDARI-AZARI:**  For Plaintiff, I believe they

23   have broken it up into different areas.  But I believe Mr.

24   Matthews is lead counsel for many of the discovery issues as

25   far as I understand and I apologize if you're not.

42

1          **MR. MATTHEWS:**  No apology necessary.

2          **MS. ESKANDARI-AZARI:**  But I believe that essentially

3   whoever has the true decision-making power for that particular

4   area of how it's broken up since as you know, this is a very

5   large case, that would be our preference.

6          And in addition, we would like to request that the

7   Court allow us leave to contact the chambers if, in the middle

8   of a deposition more of these same issues arise.

9          **THE COURT:**  I would always encourage you -- here's

10  what I would recommend on that.  You know, take my Clerk's

11  number with you but also let her know in advance the deposition

12  schedule.  You can just send her an email, let her know what's

13  coming up because I obviously have a lot of other matters going

14  on and if I'm here and available to help you resolve it, I

15  don't mind taking a telephone call to try and resolve it.

16         What I would say about that is I don't think it's the

17  most efficient way to resolve it if every ten minutes lawyers

18  are calling me about a different issue.  What I'd prefer --

19  that the parties try to get as much of the deposition completed

20  as possible and reserve the contested issue until the end, if

21  they can if it's actually like a substantive area.

22         Something like this, you know, where you're concerned

23  -- I wouldn't have been able to resolve it if you had called

24  me.  I'm not comfortable resolving it on the ex parte.  So, you

25  know, I'm not sure I really could have helped you out there.

1    But in other circumstances, I'm happy to take a phone call and

2    help the parties if I can and certainly if it will avoid the

3    filing of a motion.  I'll be very happy to help you.

4           So, I guess my question for Big Baboon, do you think

5    what counsel has asked for is going to create problems for you?

6    I mean, I tend to agree with her that -- I'm not sure who's

7    been at the meet and confers but sometimes -- and I understand

8    you're very busy.  You've got a lot of Defendants here.  This

9    is a big case.  But if you send somebody from the firm who's

10   not as familiar with the issues just to have sort of -- to meet

11   my order but not to really have a full discussion, it's not

12   that helpful.

13           **MR. MATHEWS:**  Your Honor, that has never been -- that

14   has never been our design or plan.  To the extent that I've --

15   I don't even know if you were really asking if I would attend

16   the meet and confer.  I guess I was assuming that you were

17   saying that when I attend things appear to go more smoothly,

18   but every time that we've had, as Your Honor has recognized, a

19   discovery issue arise with one of the number of Defendants in

20   this case, if I can't attend -- and I'm not the only one who's

21   making strategic decisions in this case, whoever we do send is

22   someone who is very familiar with the issues, has most likely

23   worked on the briefing associated with the dispute and has met

24   with myself and other team leaders to discuss the strategy and

25   where we are and what we can agree to do and what we can't

44

1    agree to do and what a possible resolution would be.

2         So I don't perceive it would be a problem.  It would

3    be a problem if what Defendants' Counsel is asking that I

4    attend every meet and confer.  I don't know if I can -- well,

5    I'm not sure I could do that and I'm not sure the Defendants

6    would be willing to always design their meet and confer

7    schedules around my schedule.

8         **THE COURT:**  Right.  No, I think that would be

9    difficult.

10        **MS. ESKANDARI-AZARI:**  And, Your Honor, it's certainly

11   not our intent to request Mr. Mathews be at all of them, but

12   merely somebody with the authority to truly decide -- I mean,

13   truly meet and confer and craft resolution if it's possible.

14        **THE COURT:**  Yeah, I guess I don't know how I

15   incorporate that into my order without ordering Mr. Mathews to

16   be at every one, and I can understand why that would be

17   difficult for him.  I guess what I would say is this:  if you

18   run into a situation or any other where they feel the meet and

19   confer was ineffective because the lawyer who showed up was not

20   prepared to -- either because they lacked authority or

21   seniority or experience or knowledge, for any reason to have a

22   meaningful meet and confer, then I would, you know, as that you

23   contact Mr. Mathews.  And that if you get that kind of letter

24   from Counsel that you would then have a second meet and confer

25   with your presence, so that will solve that problem, okay?  So

45

1    we'll just do it again basically if it's not meaningful.

2         **MR. MATHEWS:**  Understood, Your Honor.

3         **THE COURT:**  Okay.  All right.

4         **MS. ESKANDARI-AZARI:**  Thank you.

5         **MR. BROWN:**  Your Honor, can I address one point in

6    your --

7         **THE COURT:**  Sure.

8         **MR. BROWN:**  -- proposed order.  You indicated that

9    you were going to order an additional five hours of depositions

10   of Mr. Yuri.

11        **THE COURT:**  Yes.

12        **MR. BROWN:**  And that seems to presume -- at least in

13   part, a ruling on the motion that you've asked to prepare on

14   full briefing as to the propriety of the objections and

15   instructions that were made during the deposition.  And I'd

16   like Your Honor to withhold making that order until Your Honor

17   has had a chance to look at the full briefing on the issue and

18   decide whether it's really justified by what happened at the

19   deposition.

20        **THE COURT:**  Okay.  Well, I guess I was anticipating,

21   since I said you could file it on an expedited basis, that that

22   would be filed sometime within the next week, okay?  And -- I

23   mean, I'm not saying I need a treatise on the attorney/client

24   privilege, but I just found that there was -- you know,

25   understandably, the ex parte was filed, I think, yesterday?

46

1          **MS. ESKANDARI-AZARI**:  Friday.

2          **THE COURT**:  But I didn't get it until yesterday and I

3    got the opposition yesterday.  So that's very little time to

4    address these issues and to brief it.  So I'm not looking for

5    more length, I'm looking for more focused analysis and more

6    cases.

7          **MR. BROWN**:  Right, but I'm just -- I'm asking the

8    Court to wait for full consideration of that briefing --

9          **THE COURT**:  But I'm making that order -- I'm not

10   making that order based on the attorney/client privilege.  I

11   was unhappy with the conversation that took place, and it's on

12   Page 37, that the witness had to leave at 12:30 today and it

13   was the first time opposing counsel found out about it.  And

14   Ms. White (phonetic), as counsel, said why wasn't this

15   mentioned before and you said, it's being mentioned now.  If

16   you need more time we'll resume at 2:30, but then later cut it

17   off at 6:00 o'clock.  So I just -- that's not acceptable.  It's

18   a seven-hour deposition with reasonable breaks.

19         **MR. BROWN**:  Okay.  Thank you, Your Honor.

20         **THE COURT**:  Sure.  Okay, thank you both very much.

21         **MR. BROWN**:  Thank you.

22         **THE CLERK**:  This Court is now adjourned.

23      **(This proceeding was adjourned at 11:16 a.m.)**

24

25

---

**EXCEPTIONAL REPORTING SERVICES, INC**

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    June 24, 2010

                Signed                                         Dated


*TONI HUDSON, TRANSCRIBER*