1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Frederick A. Lorig (Bar No. 057645)
2    fredericklorig@quinnemanuel.com
     Chris A. Mathews (Bar No. 144021)
3    chrismathews@quinnemanuel.com
     Danielle L. Gilmore (Bar No. 171457)
4    daniellegilmore@quinnemanuel.com
     Bruce R. Zisser (Bar No. 180607)
5    brucezisser@quinnemanuel.com
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California  90017-2543
   Telephone:   (213) 443 3000
7  Facsimile:   (213) 443 3100

8  Attorneys for Plaintiff
   Big Baboon, Inc.

9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12                   WESTERN DIVISION

13  BIG BABOON, INC., a Delaware         CASE NO. CV 09-01198 SVW (SSx)
    corporation,
14                                       Courtroom of the Honorable Stephen V.
                                         Wilson
15           Plaintiff,

16      vs.                              PLAINTIFF'S NOTICE OF
                                         DECEMBER 20, 2010 PATENT
17  DELL INC., a Delaware corporation, et OFFICE REJECTION OF CLAIMS OF
    al.                                  THE '275 PATENT, SUBMITTED IN
18                                       SUPPORT OF PLAINTIFF'S
             Defendants.                 MOTION TO STAY PROCEEDINGS
                                         PENDING REEXAMINATION OF
19                                       THE PATENTS-IN-SUIT

20                                       Trial Date:   Not Set

21

22

23

24

25

26

27

28

03382.21992/3878305.1

quinn emanuel

Further to Plaintiff's Motion to Stay Proceedings Pending Reexamination by the U.S. Patent Office (D.I. 275), filed June 28, 2010, Plaintiff submits the most recent communication from the Patent Office concerning the reexamination of the patents-in-suit.  On December 20, 2010, the Patent Office mailed a 32 page office action in the re-examination of U.S. Patent No. 6,343,275 (the "'275 patent"), rejecting claims 1-14 and 16-19 of the '275 patent.

Attached for the Court's consideration is a copy of the office action, which Plaintiff submits in further support of its request that the Court stay further proceedings in this case until after the Patent Office has completed its review of the claims of the patents-in-suit, so that the Court will have the benefit of the Patent Office's expertise and final decision on allowable claims before ruling on Defendants' pending and threatened Summary Judgment motions.

DATED:  December 23, 2010          Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN. LLP


By /s/ Christopher A. Mathews
    Christopher A. Mathews
    Attorneys for Plaintiff
    Big Baboon. Inc.

03382.21992/3085503.1

quinn emanuel

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/010,961 | 04/28/2010 | 6,343,275 | 8257-83496-03 | 7792 |

35037          7590          12/20/2010

WAGNER, ANDERSON & BRIGHT, PC
3541 OCEAN VIEW BLVD
GLENDALE, CA  91208

| EXAMINER |
|---|
| |

| ART UNIT | PAPER NUMBER |
|---|---|
| | |

DATE MAILED: 12/20/2010

Please find below and/or attached an Office communication concerning this application or proceeding.

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patents and Trademark Office
P.O.Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS
KLARQUIST SPARKMAN, L.L.P.
ONE WORLD TRADE CENTER SUITE 1600
121 S.W. SALMON STREET
PORTLAND, OR 97204

Date:
MAILED

DEC 20 2010

CENTRAL REEXAMINATION UNIT

## EX PARTE REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. : 90010961
PATENT NO. : 6343275
ART UNIT : 3993

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified ex parte reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the ex parte reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

| **Office Action in Ex Parte Reexamination** | **Control No.** 90/010,961 | **Patent Under Reexamination** 6,343,275 |
| --- | --- | --- |
| | **Examiner** Jeffrey D. Carlson | **Art Unit** 3992 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a☐ Responsive to the communication(s) filed on _____ .   b☐ This action is made FINAL.
c☒ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐ Notice of References Cited by Examiner, PTO-892.    3. ☐ Interview Summary, PTO-474.
2. ☐ Information Disclosure Statement, PTO/SB/08.    4. ☐ _____.

Part II    SUMMARY OF ACTION

1a. ☒ Claims *1-19* are subject to reexamination.

1b. ☐ Claims _____ are not subject to reexamination.

2. ☐ Claims _____ have been canceled in the present reexamination proceeding.

3. ☒ Claims *15* are patentable and/or confirmed.

4. ☒ Claims *1-14 and 16-19* are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ The drawings, filed on _____ are acceptable.

7. ☐ The proposed drawing correction, filed on _____ has been (7a)☐ approved (7b)☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All  b)☐ Some* c)☐ None    of the certified copies have

    1☐ been received.

    2☐ not been received.

    3☐ been filed in Application No. _____ .

    4☐ been filed in reexamination Control No. _____.

    5☐ been received by the International Bureau in PCT application No. _____.

    * See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D. 11, 453 O.G. 213.

10. ☐ Other: _____

cc: Requester (if third party requester)

Application/Control Number: 90/010,961                                    Page 2

Art Unit: 3992

## *EX PARTE REEXAMINATION NON-FINAL OFFICE ACTION*

This is a reexamination of US Patent 6,343,275. Claims 1-19 are pending.

Claims 1-19 are subject to reexamination in this office action.

### *Patent Owner's Statement*

No statement of the patent owner has been submitted into the record.

### *Amendment by Patent Owner*

No amendments by patent owner have been submitted into the record since the

order for reexamination of 6/23/2010.

### *Information Submissions*

No information submissions have been submitted into the record since the order

for reexamination of 6/23/2010.

### *Claim Rejections - 35 USC § 102*

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for a patent.

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

Application/Control Number: 90/010,961                                    Page 3
Art Unit: 3992

Claims 1-3 are rejected under 35 U.S.C. 102(a) as being anticipated by

Sackmary ("A new twist to a quality classic", Quality Progress, March 1997).

Sackmary is summarized as teaching a world wide web (www) site that enables

customers to request product returns and which enables tracking and classification of

the returns.

Regarding claim 1, **A method of processing customer service requests**

**relating to a product, including returns, over the Web, comprising:** (Sackmary

teaches "[W]hen customers access the service center [WWW] site...they are given the

option to either start the process of returning a product or check the status of one that

they had previously returned" [page 106, col 2, lines 18-23]).

**defining an automated workflow process for customer service requests,**

**including returns, that uses a database and a Web-enabled database**

**management system;** ("The screen for starting the *return process* is easy to use.

Customers simply enter their name, address, quantity of returned products, and reason

for retune. In addition, they are given a return material authorization (RMA) number to

include on the mailing label that they will use to send the product back. The RMA

number and customer information are automatically entered into a database." [pg 106,

col 2 lines 24-30]. This RMA assignment represents a defined automated workflow as

part of the noted *return process*. The abilities for a customer to enter data into the

database and to query data for a return status, both via a www GUI, are representative

of a database and associated web-enabled database management system.)

Application/Control Number: 90/010,961                                    Page 4
Art Unit: 3992

**a customer making a purchase from a merchant; and** ("Sales returns" [pg 106

col 2 line 1] inherently defines a customer purchase from a merchant.)

**the customer, via the Web in a self-help manner, causing a customer-**

**service/return record to be created in the database,** (The RMA number and

customer information are automatically entered into a database." [pg 106, col 2 lines 24-

30]) **to be processed by the merchant wherein the customer-service/return record**

**created is related to a pre-existing database record** (Patent owner's language of "to

be processed" and "wherein the record is related..." do not set forth any particular steps

to be carried out as part of the claimed method.   Nonetheless, Sackmary clearly

teaches several activities (return requests, RMAs, mailing labels, status queries,

reports) that are based on the return records and therefore teach "processed" return

records.   Further, Sackmary teaches that the system "*tracks products* that have been

shipped from the factory and later returned...Tracking returned *products*" [pg 105 col 1

lines 19-24].   Therefore the system is taken to identify pre-existing product records and

associate them with return records.   Further, Sackmary teaches tracking a class/type of

return called "sales returns" which are "[sold] units that have been returned by

distributers...they are inspected, tested and returned to inventory.   This is taken to

teach a relationship between product records, sales records, inventory records and the

return records.

**and wherein, for at least some customer-service/return records, the**

**automated workflow process reverses a previously executed workflow process.**

(a customer using the mailing label to return the product to the company is taken to

"reverse" the original mailing process of the sold product.  Further, Sackmary teaches

restocking returns [pg 106 col 2 lines 1-2]).  Sales returns are taken to inherently include

a credit to the customer, thereby reversing an original payment process.

    Regarding claim 2, **The method of claim 1, wherein the customer-**

**service/return record is categorized in accordance with types including multiple**

**ones of the following types:**  (prior art showing two of the following would indeed meet

the claim scope)  **under warranty part not required, under warranty part required,**

**out of warranty part not required, out of warranty part required, mis-shipped,**

**refused, lost or damaged with or without insurance claim, missing components,**

**duplicate shipment, inventory, cancellation, transferred order, and never shipped.**

(Sackmary classifies returns into categories which includes one of "Sales returns" [pg

105 col 1 lines 34-45].  This is taken to meet a categorization type of "refused" but also

can be interpreted as representative of  at least "duplicate shipment", "inventory",

"cancellation".  Sackmary also teaches "Performance returns" for malfunctioning

products [pg 105 col 2 lines 1-8] and inherently includes the return classifications shown

in figure 2 on page 106 – "missing part", "defective part".  These can be interpreted as

within the claim scope of "lost or damaged with or without insurance claim" and "missing

components".)

    Regarding claim 3, **The method of claim 2, including hierarchically related**

**customer service/return record types.**  (Sackmary's return record types include

"Performance returns" for malfunctioning products [pg 105 col 2 lines 1-8] which also

Application/Control Number: 90/010,961                                    Page 6
Art Unit: 3992

inherently include a hierarchical collection of sub-types of performance returns such as

those shown in figure 2 on page 106 – "missing part", "defective part", etc. )


<u>Claims 4-10, 13-14, 16-19 are rejected under 35 U.S.C. 102(b) as being</u>

<u>anticipated by SAP's "R/3 System Release 3.0E Online Documentation" (herein referred</u>

<u>to as "3.0E documentation").</u>

Based on the evidence of record, including the declaration of Stefan Nuber filed

4/28/2010, this "3.0E documentation" is considered to qualify as a printed publication

with an available date at least as early as 9/16/1996.

<u>Regarding claim 4</u>, **In a Web-based business-to-business electronic**

**commerce system including a database and a Web server, a method of**

**transaction processing, comprising the step of:** (3.0E documentation refers to the

buying customer as a "business partner" [page 24], thereby teaching a business-to-

business electronic commerce system and methods.  3.0E documentation teaches an

example architecture as a "Central System" [page 14] in which a DBMS (database

management system) is used to offer various services via a "single host" (the host being

a server platform and being accessible from many computers/users over a network).

Also described is the client/server architecture [bottom of page 9] that includes the

database service.  While 3.0E documentation may not explicitly mention a "Web-

enabled" system, patent owner defines "Web commerce" [US Patent 6,343,275, col 1,

lines 18-19] as the "use of a computer network" to do business, such as buy and sell.

Patent owner includes an example "such as the Internet", yet the definition in no way

Application/Control Number: 90/010,961                                    Page 7
Art Unit: 3992

*requires* the Internet, nor anything beyond "a computer network".  Given such an

interpretation, 3.0E documentation can be taken to accomplish "Web commerce" using

a "Web Server")

**obtaining from multiple parties via the Web demand information specifying**

**an item to be the subject of a transaction;**

"Electronic Data Interchange (EDI) enables you to exchange structured data with
business partners who also use EDI. During sales order processing, you can send or
receive various kinds of output through the EDI interface. For example, you can create
sales documents with information received through EDI and then process them." [page
130].

"The following EDI inbound messages are available in the system. EDI standard terms
are listed first followed by SD standard terminology:
• Request for quotes - Inquiry (IDoc structure ORD-ID01)
Incoming sales orders with configurable materials (as of Release 3.0D)
Transaction set-REQOTE-
•Purchase order - Sales order (IDoc structures ORDERS01 and ORDERS02)
Transaction set-ORDERS-" [page 127].

**and within said database, organizing transaction information into self-**

**contained workflow units having a predetermined format and each including**

**demand information for a particular party, the predetermined format defining a**

**command demand document**

("Inbound EDI messages are converted by an external translator into the SAP format.
They are stored as intermediate documents. From there, they can be transferred into
the SAP applications...

...The intermediate documents are known as IDocs. The structure and the format of
these intermediate documents is uniquely defined and represents an SAP standard.
The individual applications are compatible with various EDI standards." [page 130]

Application/Control Number: 90/010,961                                    Page 8

Art Unit: 3992

The claimed self-contained workflow units are met by the particularly-formatted

documents. A request for quote includes demand information from a particular party

making the request.

"Request for quotes -Inquiry (IDoc structure ORD-ID01)
Incoming sales orders with configurable materials (as of Release 3.0D)
Transaction set-REQOTE-" [page 127])

    **enabling demand information to be capsuled for a range of differentiated**

**business transactions of different complexity.** (This is not taken to require any

particular or positively claimed step as part of the method. However 3.0E

documentation's request for quotes document and the sales order document and the

shipping schedule document [top of page 127] each represent capsuled information

regarding such a workflow (quote request, sales order, shipping schedule). Even this

small collection of workflow/documents is taken to represent "a range" of business

transactions of different complexities.


    Regarding claim 5, **The method of claim 4, wherein the database contains**

**workflow units derived from multiple ones of the following sources: customer,**

**vendor, and database owner;** There are many stored instances of customer data,

vendor data and database owner data in the R/3 system. Further, a sales order

document includes both customer information from the customer and product

information which is taken to be information from the seller (database owner).)

**the method comprising the further step of grouping demand information**

**from different ones of said sources.** (By virtue of identifying each different type of

document, the system therefore logically groups all documents together. Request for

quote documents are identified differently within the system from purchase order

change requests documents. Further, a single request for quote document represents

grouped demand (request) information which is separate from the collection of

(grouping of) demand information regarding another single document instance.)

Regarding claim 6, **The method of claim 4, wherein said workflow units are**

**each related to one or more item-level records,**

("Electronic Data Interchange (EDI) enables you to exchange structured data
with business partners who also use EDI. During sales order processing, you can send
or receive various kinds of output through the EDI interface. For example, you can
create sales documents with information received through EDI and then process them."
[page 130].

A purchase order received via EDI is taken to result in a purchase order entry (a

record for a product-item) into the R/3 database. )

**updates to which are immediately and automatically propagated**

**throughout the database** (There is no positively recited method step of updating or

propagating here. Nonetheless, 3.0E documentation teaches a system where input

data is not only available immediately but also shareable with workers from other areas.

Postings in accounts payable are simultaneously recorded in the General Ledger, with
different G/L accounts being updated according to the transaction involved (payables,
down payments). [page 37].

The individual applications in the SAP System are fully integrated. All data that is used
across applications is stored at client level. Parts of customer and vendor master
records, for example, are stored centrally and used in the applications Financial
Accounting (FI), Sales and Distribution (SD) and Materials Management (MM).

Application/Control Number: 90/010,961                                   Page 10
Art Unit: 3992

The individual applications also exchange data so that business transactions do not
need to be entered more than once. For example, invoices that are posted in SD are
passed on to FI, and data that is entered in FI is passed on to other applications. If you
use Cost Center Accounting (CCA), for example, you can specify a cost center directly
when you enter a document, to which the amount entered in the line item is to be
posted.  [page 38].

When you post documents to accounts the system automatically updates the account
balance. In addition, for G/L accounts that are managed with line item display, the
system notes which items from the document were posted to the account. It is therefore
possible to view the account balances and (depending on the specifications in the
master record) the line items for every G/L account.  [page 40])

   Regarding claim 7, **The method of claim 4, wherein a workflow unit is related**

**to at least one of a related workflow unit and a customer-service/return record.**

(3.0E documentation teaches that requests for returns can be handled by the system

[page 26].  3.0E documentation also teaches that the "document flow" can describe the

history of a sales document; this includes related documents from quotation, sales

order, delivery, invoice AND returns.  [see Displaying a Document Flow – page 29])

   Regarding claim 8, **The method of claim 4, further comprising displaying a**

**workflow unit in said predetermined format, including displaying as part of said**

**predefined format a plurality of user options for taking action with respect to the**

**workflow unit or with respect to items specified within the workflow unit.**

*"The document flow describes the history of a sales document as shown below:*
*Quotation*
*.Sales order*
*..Delivery*
*...Invoice*
*..Returns*
*... Delivery*
*.... Credit for returns*

*The document flow is updated at document level as well as for individual items.*

Application/Control Number: 90/010,961                    Page 11
Art Unit: 3992

*Regardless of which document you select for document flow display, all preceding and subsequent documents are always listed."* [page 29]

"You can select any document from the list by positioning the cursor on the document and selecting *Display document." [page 30]*

Being able to display the list of related documents and being able to position the cursor on a particular document on the list coupled with the selection of the "Display document" user interface element provides for displaying of multiple user option (for taking actions).

Regarding claim 9, **The method of claim 4, wherein said demand information is current customer demand information obtained via said Web server.** (The incoming EDI requests/demands are taken to be sent over a computer network. Given the interpretation of "Web" as described by the examiner above, this is therefore taken to meet current customer demand information obtained via said Web server.

Regarding claim 10, **The method of claim 4, wherein said demand information is internally generated.** (While claim 4 requires that demand information be obtained "via the Web", the creation and storage of the abovementioned documents resulting from an incoming EDI request meets the step of *internally generating* the demand information.

Regarding claim 13, **A method of establishing an end-to-end business-to-business commerce system in which product items are sold,** (3.0E documentation describes a computer system that allows online sales and includes management of end-to-end phases of commerce:  See "Document flow" for "Quotation" through "Credit for returns" [top of page 29 (of 293 pages)].  3.0E documentation refers to the buying

Application/Control Number: 90/010,961                                    Page 12
Art Unit: 3992

customer as a "business partner" [page 24], thereby teaching a business-to-business

system and methods]).

**using a Web-enabled relational database management system running on a**

**server platform,** (3.0E documentation teaches an example architecture as a "Central

System" [page 14] in which a DBMS (taken to manage a *relational* database structure

[see pg 162 lines 1-2], see "ORACLE RDBMS" [page 160 line 1]) is used to offer

various services via a "single host" (the host being a server platform).  Also described is

the client/server architecture [bottom of page 9].  While 3.0E documentation may not

explicitly mention a "Web-enabled" system, patent owner defines "Web commerce" [US

Patent 6,343,275, col 1, lines 18-19] as the "use of a computer network" to do business,

such as buy and sell.  Patent owner includes an example "such as the Internet", yet the

definition in no way *requires* the Internet, nor anything beyond "a computer network".

Given such an interpretation, 3.0E documentation can be taken to accomplish "Web

commerce" and can be taken to be a "Web-enabled" system.)

Further, the term (Web) appears only in the preamble of the claim and is not

present in the body of the claim, nor any particular method step.  Therefore the term

"web" does not serve to limit the scope of the claim and need not be present in the prior

art for a proper rejection.

**the method comprising the steps of:  providing within a single automated**

**system** (the R/3 system is taken to be a single, automated system having various

integrated parts.)

Application/Control Number: 90/010,961                              Page 13
Art Unit: 3992

**data and methods spanning multiple business functions, the data being**

**stored in accordance with a single database schema;**

*("The individual applications also exchange data so that business transactions do not need to be entered more than once. For example, invoices that are posted in SD are passed on to FI, and data that is entered in FI is passed on to other applications. If you use Cost Center Accounting (CCA), for example, you can specify a cost center directly when you enter a document, to which the amount entered in the line item is to be posted." [page 38]*

*"Both the accounting department and the sales and distribution department have access to the customer master record. In order to avoid data redundancy, the data for both departments is stored in a common master record." [page 123]*

*"General data, like address and telephone number, etc., is maintained for every customer. This data is only identified by the customer number, not by company code or sales area. Maintaining the data is possible from both the accounting view and the sales and distribution view." [Page 123]*

*"The individual applications in the SAP System are fully integrated. All data that is used across applications is stored at client level. Parts of customer and vendor master records, for example, are stored centrally and used in the applications Financial Accounting (FI), Sales and Distribution (SD) and Materials Management (MM). )*

**providing a user interface that allows open navigation by a user between**

**information pertaining to different business domains, and, for each of multiple**

**business functions, displaying within an integrated decision making environment**

**complete information required to perform that business function; and**

### *"Jumping Directly to a Task with Transaction Codes*

*After you log on to the R/3 System, you need to choose the application and the task that you want to work on, then choose a function to start the task. As you are working, you may decide you want to start a different task, at which point you will need to choose the new application and function.*

*By entering a transaction code instead of using menus, you can go to a task and start the function in a single step. Although using transaction codes efficiently requires some memorization of codes, it is also a quicker way to get around in the R/3 System.*

Application/Control Number: 90/010,961                              Page 14
Art Unit: 3992

### What is a transaction code?

*A transaction code is a four-character code that takes you directly to the screen for the task you want to perform. Say, for example, that you work in the Accounts Receivable application, and your task is to create a customer master record. You can use menus to create the customer master record, or you can use transaction code fd01 -the transaction code for creating a customer master record in the Accounts Receivable.*

*You can use a transaction code to go to tasks in other applications, not just the application in which you are working. For example, if you are working in the Accounts Receivable application, you can go to a task in the Accounts Payable application". [page 6]*



*[page 8]*

This provides for a user interface that not only allows a user to navigate different

business domains (such as Accounts Receivable vs. Accounts Payable, as in the

Application/Control Number: 90/010,961                                        Page 15
Art Unit: 3992

example above), or Accounting vs. Human Resources as in the toolbar displayed in the

figure above. This screen-based system provides an "integrated decision making

environment", even when the tasks/decisions are as simple as creating a customer

master record. The ability to complete a business function such as "creating a sales

order", including the information needed to manage/determine/decide all of the relevant

options can be accomplished with the system:

To create a standard sales order, proceed as follows:
1. Select *Logistics* → *Sales distribution* → *Sales* on the main menu screen.
2. Select *Sales order* →*Create*.
3. Enter the order type and, if necessary, the organizational data.
The values for sales organization, for distribution channel and the division are usually
proposed from user-defined parameters. Entries for the sales office and the sales group
are optional.
4. Press ENTER.
5. Enter the following data:
- Customer number of the sold-to party
- Customer's purchase order number
- Material numbers
- Order quantities for the materials
6. Press ENTER.
If you defined several unloading points or several ship-to parties in the customer master
record of the sold-to party, for example, the system displays the alternatives in a dialog
box. The system can display alternatives for any or all of the following data:
- Unloading point
- Ship-to party
- Payer
- Bill-to party
7. Select the valid data from these proposals by positioning the cursor on the line and
select Choose.

[page 126]


Further, 3.0E documentation teaches that executives can be shown within the

system screen, information from various areas/domains so that they can make effective

and high level decisions:

Application/Control Number: 90/010,961                                     Page 16
Art Unit: 3992

"As data comes from different areas, you can structure the data in separate datasets
(so-called aspects) for different business purposes. You can define various aspects
containing, for example, information on the financial situation, logistics, human
resources, the market situation and stock prices for your company. Reports can be
created to evaluate the data in each aspect. You can either carry out your own ad hoc
evaluations in the SAP-EIS presentation (reporting) system or analyze the data using
report collections created individually for your specific requirements. You access the
SAP-EIS presentation functions via menu options *Information systems --> EIS.*

In order to access the SAP-EIS application menu, choose *Accounting --> Enterprise
control --> Executive Info. System.* The customizing tasks to be carried out and settings
to be made are described and performed in Customizing (implementation guidelines).
To call up the presentation functions from the application menu, choose *Environment-->
Executive menu."* [page 35]


**dynamically defining multiple virtual business departments by, for each of**

**multiple groups of people, assigning substantially similar access privileges to**

**each person within the group, wherein the access privileges of different groups**

**are substantially different.**

**"***Since every company area in the SAP System can define its own structure, you must
specify how each structure is to be derived from the others so that data can be
transferred from one application to another. You make this assignment once in the
system. No further specifications are required during data transfer. You require these
specifications for the following company areas, depending on whether you use the
corresponding applications:*
• *Sales and Distribution*
• *Materials Management*
• *Controlling*
• *Human Resources*
• *Treasury"* [page 38].

The users in each business area/domain also need appropriate authorization to access

the particular features within the business area:

*"Example: To create your own profile for customer accounts clerks, you could copy the
predefined profile F_DEBITOREN to F:DEBITOREN. Changing only the second*

Application/Control Number: 90/010,961                              Page 17
Art Unit: 3992

*character makes the new profile name unique, but you can easily tell where the profile
came from.*

3. Maintain the profile and the authorizations in it.

Delete the authorizations that you do not require by deleting the corresponding lines
from the profile.

If you need to alter an authorization, then you should first copy it. Delete the original
authorization from your profile and enter your copy in its place. You can then edit the
authorization by double-clicking on it. Do not edit the original authorization, as your
changes may be overwritten when you update your system with a new release.

You can add new authorizations by selecting them with the add authorization function.
This function displays authorizations that have already been defined according to object
class and object.

4. Activate each authorization that you modify as you edit it.

5. When you have finished editing authorizations, activate the profile. It is ready for
use."
[page 178].

    <u>Regarding claim 14</u>, **The method of claim 13, wherein different people within
the same virtual department work in geographically distant locations.** (3.0E
documentation teaches the ability to support multiple Sales offices (Boston, New York)
within the R/3 system. Salespersons Miller in Boston and Fisher in New York are
geographically distant, yet both are defined to work in Sales [page 237]. 3.0E
documentation also teaches of the use of wide area networks (WANs) to establish
required communications with the system [see end of page 21].

    Further, 3.0E documentation teaches various approaches for
providing/distributing the system at a central host(s) and which are remotely accessed
by users.

Application/Control Number: 90/010,961                                   Page 18
Art Unit: 3992

"These are logical divisions of the services provided by an R/3 System, and the mapping process distributes these services across one or more physical host machines. The R/3 System services can be further logically divided, as described below: " [end of page 9]

Therefore whenever any user accesses the system remotely (logs in), that user is a remote user.  Therefore users, including users in the same virtual department, are remote or geographically distant from the host(s).  Further, there is no requirement in 3.0E documentation that users who work in same department must be co-located.  3.0E documentation teaches the deployment of R/3 for small, medium and large installations [see "Recommendations", page 17-18].  Applicant does not appear to define any minimum threshold distance.  Therefore any two users in the Sales department for example are taken to be in "geographically distant locations" from each other if they work in a different cubicle, office room, suite, floor, wing, building, campus or facility.  Any Sales department with any appreciable size would inherently have to locate their Salespeople in different cubicles, office rooms, suites, floors, wings, buildings, campuses or facilities.)

Regarding claim 16,  **A system for end-to-end, business-to-business electronic commerce, comprising:** (3.0E documentation describes a computer system that allows online sales and includes management of end-to-end phases of commerce:  See "Document flow" for "Quotation" through "Credit for returns" [top of page 29 (of 293 pages)].  3.0E documentation refers to the buying customer as a "business partner" [page 24], thereby teaching a business-to-business system).

**a server platform running a Web-enabled relational database management system;** (3.0E documentation teaches an example architecture as a "Central System"

in which a DBMS (taken to manage a *relational* database structure) is used to offer

various services via a "single host" (the host being a server platform).  While 3.0E

documentation may not explicitly mention a "Web-enabled" system, patent owner

defines "Web commerce" [US Patent 6,343,275, col 1, lines 18-19] as the "use of a

computer network" to do business, such as buy and sell.  Patent owner includes an

example "such as the Internet", yet the definition in no way *requires* the Internet, nor

anything beyond "a computer network".  Given such an interpretation, 3.0E

documentation can be taken to provide a system for "Web commerce" and can be taken

to be a "Web-enabled" relational database management system.)

**stored in the database, an item table comprising item records, each item**

**record containing business domain-specific fields pertaining to a plurality of the**

**following business domains: products, payments, performance and personnel;**

(This feature positively requires a database having a table having records having fields.

The particular values or information in these fields, records and tables are taken to

represent nonfunctional descriptive material.  Any differences in subject matter are only

found in the nonfunctional descriptive material and are not functionally related to the

structure of the system.  Thus, this descriptive material will not distinguish the claimed

invention from the prior art in terms of Patentability, see *In re Gulack*, 703 F.2d 1381,

217 USPQ 401, 404 (Fed. Cir. 1983); *In re Lowry*, 32 F.3d 1579, 32 USPQ2d 1031

(Fed. Cir. 1994).  Therefore, it would have been obvious to one of ordinary skill at the

time of the invention to have stored any type of data content within the data system of

3.0E documentation.

Application/Control Number: 90/010,961                                    Page 20
Art Unit: 3992

Nonetheless, 3.0E documentation teaches the database as storing records having fields that indeed pertain to specific business domains such as products, payments, performance and personnel.   The system tracks purchases which are related to many domains (products purchased, payments made for the purchases, sales delivery and optionally return "performances", sales personnel/sales people.)

*"The individual applications in the SAP System are fully integrated. All data that is used across applications is stored at client level. Parts of customer and vendor master records, for example, are stored centrally and used in the applications Financial Accounting (FI), Sales and Distribution (SD) and Materials Management (MM)" [page 38].*

*("The individual applications also exchange data so that business transactions do not need to be entered more than once. For example, invoices that are posted in SD are passed on to FI, and data that is entered in FI is passed on to other applications. If you use Cost Center Accounting (CCA), for example, you can specify a cost center directly when you enter a document, to which the amount entered in the line item is to be posted." [page 38]*

*"Both the accounting department and the sales and distribution department have access to the customer master record. In order to avoid data redundancy, the data for both departments is stored in a common master record." [page 123]*

*"General data, like address and telephone number, etc., is maintained for every customer. This data is only identified by the customer number, not by company code or sales area. Maintaining the data is possible from both the accounting view and the sales and distribution view." [Page 123]*

**software for reading item records, organizing selected information from the item records, and presenting the selected information as domain-specific displays;** (The data stored in the system can be accessed/queried and organized into a meaningful output for an information worker using the system.  [See SAPGUI, page 10]. For example, a user can display stock levels for a given material according to data stored in the system [bottom of page 83].)

Application/Control Number: 90/010,961                                    Page 21
Art Unit: 3992

**whereby, once item information has been input and committed, it is immediately available for viewing by a multiplicity of information workers, different information workers having responsibility for different ones of said domains.** (This "whereby" clause is taken to represent mere intended use. There are no limitations set forth specifying any particular further structure of this system. Nonetheless, 3.0E documentation teaches a system where input data is not only available immediately but also shareable with workers from other areas.

Postings in accounts payable are simultaneously recorded in the General Ledger, with different G/L accounts being updated according to the transaction involved (payables, down payments). [page 37].

The individual applications in the SAP System are fully integrated. All data that is used across applications is stored at client level. Parts of customer and vendor master records, for example, are stored centrally and used in the applications Financial Accounting (FI), Sales and Distribution (SD) and Materials Management (MM).

The individual applications also exchange data so that business transactions do not need to be entered more than once. For example, invoices that are posted in SD are passed on to FI, and data that is entered in FI is passed on to other applications. If you use Cost Center Accounting (CCA), for example, you can specify a cost center directly when you enter a document, to which the amount entered in the line item is to be posted. [page 38].

When you post documents to accounts the system automatically updates the account balance. In addition, for G/L accounts that are managed with line item display, the system notes which items from the document were posted to the account. It is therefore possible to view the account balances and (depending on the specifications in the master record) the line items for every G/L account. [page 40])

    Regarding claim 17, **The system of claim 16, wherein, information stored within a field of an item record is the only instance of that information within the entire database.**

Application/Control Number: 90/010,961                                    Page 22
Art Unit: 3992

*("The individual applications also exchange data so that business transactions do not
need to be entered more than once. For example, invoices that are posted in SD are
passed on to FI, and data that is entered in FI is passed on to other applications. If you
use Cost Center Accounting (CCA), for example, you can specify a cost center directly
when you enter a document, to which the amount entered in the line item is to be
posted." [page 38]*

*Both the accounting department and the sales and distribution department have access
to the customer master record. In order to avoid data redundancy, the data for both
departments is stored in a common master record." [page 123])*

<u>Regarding claim 18</u>, **In an automated end-to-end, business-to-business
transaction processing system including a database,** (3.0E documentation

describes a database-driven computer system that allows online sales and includes

management of end-to-end phases of commerce:  See "Document flow" for "Quotation"

through "Credit for returns" [top of page 29 (of 293 pages)].  3.0E documentation refers

to the buying customer as a "business partner" [page 24], thereby teaching a business-

to-business system and methods]).

**a method of user/system interaction for accomplishing a business task

stemming from an order, whereby business decisions normally made by an

experienced human decision maker by gathering information across multiple

business domains and applying human expertise to the gathered information are

computer automated/assisted, the method comprising the steps of:**  (3.0E

documentation teaches countless user-system interactions which enable business tasks

and decisions to be performed.  One example allows decision-oriented selections and

Application/Control Number: 90/010,961                                    Page 23

Art Unit: 3992

checking of weak areas in Logistics; this relies on data that spans different business

domains such as such as sales and inventory:

"The Early Warning System allows you to make decision-oriented selections and to
check weak areas in Logistics.
The Early Warning System allows you to search for exceptional situations and aids in
early detection and correction of undesirable situations
You can define the exceptional situations, the so-called <u>Exceptions</u> by yourself, as well
as the conditions for the follow-up processing.
An exception consists of specified characteristics or characteristic values (for example
customer, material) and requirements. The following requirements can be defined:
• Threshold Value (for example, materials/customers whose sales are greater than
10,000 DM)
• Trend (for example, materials/customers with a negative trend in sales or lead times)
• Planned/Actual Comparison (for example, which customers have a plan realization for
incoming orders of less than 80%)  [top of pg 55]."

"Displaying Exceptional Situations in the Standard Analyses

You can specify an exception when carrying out a standard analysis. In standard
analyses the exceptional situations are highlighted using color codes. Differentiation is
possible in that different colors can denote different conditions. For example, you can
choose red for an inventory turnover less than three, yellow for an inventory turnover
greater than two and green for an inventory turnover greater than five.

These color codes allow you to navigate selectively within the standard analyses. If
exceptions occur, on the material level, for example, this will be displayed on a higher
aggregation level (for example, on the purchasing organization or customer level). With
the help of the drill-down function, you can then go to the line with the corresponding
color code for the exceptional situation."  [end of page 55 to top of page 56])


**integrating within a single database business information spanning**

**multiple business domains;**

*("Both the accounting department and the sales and distribution department have
access to the customer master record. In order to avoid data redundancy, the data for
both departments is stored in a common master record." [page 123])*

Application/Control Number: 90/010,961                                  Page 24
Art Unit: 3992

**formalizing a decision-making algorithm that uses information spanning**

**multiple business domains;** (the defined "exceptions" represent formalized decision-

making algorithms and can use data from any part of the non-redundant database).

**responsive to a user action, triggering the decision-making algorithm and**

**performing at least one of the following: 1) presenting to the user results of the**

**decision-making algorithm; and 2) making a database entry enabling a**

**subsequent business process to be performed.**

("Displaying Exceptional Situations in the Standard Analyses

You can specify an exception when carrying out a standard analysis. In standard
analyses the exceptional situations are highlighted using color codes. Differentiation is
possible in that different colors can denote different conditions. For example, you can
choose red for an inventory turnover less than three, yellow for an inventory turnover
greater than two and green for an inventory turnover greater than five.

These color codes allow you to navigate selectively within the standard analyses. If
exceptions occur, on the material level, for example, this will be displayed on a higher
aggregation level (for example, on the purchasing organization or customer level). With
the help of the drill-down function, you can then go to the line with the corresponding
color code for the exceptional situation." [end of page 55 to top of page 56]")

A user action could be met by the action of defining the exception, or could be

met by a customer sale which happens to triggers the exception.  Further, 3.0E

documentation teaches that an analysis can also be triggered periodically or based on

events such as sales orders, purchase orders or stock movement  [end of page 56]).

Regarding claim 19, **The method of claim 18, wherein the business task is**

**selected from the following group: invoice collection, invoice payment, and return**

**authorization request processing.**

Application/Control Number: 90/010,961                                    Page 25
Art Unit: 3992

    (3.0E documentation also teaches a decision-making algorithm that uses stored
information spanning multiple business domains (customer, purchasing, shipping,
returns, invoicing, billing, etc.  The system includes processes and tasks (i.e. formalized
algorithms) related to customer requests (and entered request acts as a trigger) for
return authorizations and the fulfillment of that return (request, receipt of goods, credit,
new product delivery, etc.).  See pages 24-27, 216.  Part of this triggered algorithm
includes presentation to the user in the form of data screens that include information
from the database system – such as previous order numbers, etc. This triggered
algorithm also makes entries into the database ["save the document" – page 27 line 1].

### Claim Rejections - 35 USC § 103

    The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all
obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

    Claims 1-3 (alternatively) AND 11-12 are rejected under 35 U.S.C. 103(a) as
being unpatentable over Sackmary ("A new twist to a quality classic", Quality Progress,
March 1997).

    Regarding claims 1-3, Sackmary does not appear to *explicitly* state that customer
records or product records pre-exist before related return records are created.  However
Official Notice is taken that it is well known for websites and web-based services to
include customer accounts whereby existing customers are identified and their pre-

Application/Control Number: 90/010,961                            Page 26
Art Unit: 3992

existing account information (name, address, telephone numbers, billing information,

etc.,) is recalled so as to avoid inputting this often-used information.  It therefore would

have been obvious to one of ordinary skill at the time of the invention to have

accessed/related the customer's pre-existing account record so that the required name

and address as needed for return record creation can be provided and related to the

requested return.  This would predictably provide a savings on repeated typing and

reduce typing errors.  Further, Sackmary teaches that product return are classified as

"performance returns" indicating that the product did not perform properly [figure 2, page

106 col 2 lines 3-4].  Quality and Repair departments use this information to track the

performance history of shipped products.  It would have been obvious to one of ordinary

skill at the time of the invention to have also related each return to a particular product

identifier (an existing product record) so that the Quality and Repair departments could

get a sense of the performance history for each product, rather than a performance

history for an aggregation of the company's entire product line.  Relating each return to

a particular identified and preexisting product record would enable a product team to

focus on the performance history of its product(s) without concerns for performance

histories of other products outside of their work scope.

        Regarding claims 11,

        **A method of organizing and displaying information stored within a**

**database to facilitate a user task, comprising the steps of:** (Sackmary teaches that

the WWW site is designed with employees in mind whereby employees can access

information from the database in several formats [pg 106 col 2 lines 41-43].  The WWW

Application/Control Number: 90/010,961                                    Page 27
Art Unit: 3992

site provides two charts that are automatically updated whenever new information is

entered.  These charts "facilitate a user task" as evidenced by Sackmary's teaching that

the sales department uses this (chart) information to optimize its marketing and sales

plans, for example [pg 106 col 2 lines 50-60].) **specifying a classification scheme,**

**consistent with common business practice and terminology;** (Sackmary teaches

that the returned products are classified (in the database) into categories such as Sales

returns, Performance returns, and Software upgrades [pg 105 col 1 lines 34+].)

**applying an algorithm whereby items are classified, marked and displayed**

**according to classification for performing a particular business function;** (an

algorithm is used which receives classification data, marks records accordingly, and

displays the returns data as in figures 1 and 2 on page 106.  These charts are "for

performing a business function" as evidenced by Sackmary's teaching that the sales

department uses this (chart) information to optimize its marketing and sales plans, for

example [pg 106 col 2 lines 50-60].)  **and within a single display screen, displaying**

**the categorized items along with one or more user interface controls for taking**

**action with respect to one or more items.**  A chart generated by the WWW site is

taken to be displayed within a browser window (a single screen).  Official Notice is taken

that web browsers typically included user interface buttons such as a "print" button

which is also displayed within the window/screen of the browser (even if the button were

part of the typical toolbar), along with the browser content (i.e. the chart).  It would have

been obvious to one of ordinary skill at the time of the invention to have included such a

print button on the screen along with the chart content so that a manager-user could

Application/Control Number: 90/010,961                                         Page 28
Art Unit: 3992

print the chart and therefore study it in association with his business function's task (i.e.

optimize a sales plan).

Regarding claim 12, **The method of claim 11, wherein said items are**

**classified in accordance with a hierarchy of classifications such that an item is**

**classified within a highest classification within said hierarchy that pertains to**

**said item.** (The 3 main categories defined by Sackmary [returns, Performance returns,

and Software upgrades [pg 105 col 1 lines 34+] can be taken to be top levels of a

hierarchy. Further, the performance returns include additional sub categories of

"defective part, wrong part, solder bridge, cold solder, etc. [figure 2] and are further

evidence of an additional hierarchy. Indicating any return as one of the three main

categories (returns, Performance returns, and Software upgrades) provides for a

highest classification.


Claims 4-10, 13-14, 16-17 are alternatively rejected under 35 U.S.C. 103(a) as

being unpatentable over SAP's "R/3 System Release 3.0E Online Documentation"

(herein referred to as "3.0E documentation") as above, and further in view of "R/3 on the

Internet" (herein referred to as R/3 on the Internet).

Based on the evidence of record, including the declaration of Chris Burton filed

4/28/2010, "R/3 on the Internet" is considered to qualify as a printed publication with an

available date at least as early as 8/26/1996.

3.0E documentation does not appear to *explicitly* state a "web-based" system,

"web" server, obtaining demand information via the "web" or "web-enabled" relational

Application/Control Number: 90/010,961                                    Page 29
Art Unit: 3992

database management system.  While the interpretation of "web" above enables the

examiner to reject the claims simply using 3.0E documentation's network, the use of the

world wide web is obvious for the following reasons.  R/3 on the Internet teaches

benefits of the World Wide Web (www) for electronic commerce:  round-the-clock

availability, mouse-operated GUI and access to forms, accessing user needs only a

web browser, relatively low operating costs, round-the-clock sales, very up to date

customer information in electronic catalogs, and product brochures, etc [page 1].

**"The WWW can serve as an alternative user interface for R/3 business
applications, and open up new access paths and new business processes to
customers**." [page 2].

Therefore, it would have been obvious to one of ordinary skill at the time of the invention

to have provided a web server with the database-driven system of 3.0E documentation,

thereby enabling remote user access (for customers, vendors, employees, etc.) into the

R/3 system of 3.0E documentation via the www and a web browser.  This would then

provide the benefits as enumerated by "R/3 on the Internet".


**STATEMENT OF REASONS FOR PATENTABILITY AND/OR CONFIRMATION**

The following is an examiner's statement of reasons for patentability and/or

confirmation of the claims found patentable in this reexamination proceeding:

Claim 15 has been determined to be patentable over the prior art currently of

record in this proceeding.

Application/Control Number: 90/010,961                                      Page 30
Art Unit: 3992

    Claim 15 recites: "via Web administration, producing a software configuration in which selected ones of the modules are enabled or disabled".  This feature could not be found in the cited art.

    "3.0E documentation" teaches various modules/application, [Sales and Distribution, Materials Management, Controlling, Human Resources, Treasury: page 38] but not remotely configuring SAP R/3 by enabling/disabling such modules via the "web" or via a computer network.

    "Using SAP R/3" teaches modules that can be enabled and disabled:

*Some application modules depend on other applications. For example, the CO-Controlling module depends on the FI-Financial Accounting module. Some of the components of a module may be optional. Some of the functions within a component may be optional. As a result of this flexibility, each R/3 installation may be built to fit exactly the unique requirements of the client company.* [page 66].

*modules to form a specific implementation. For example: If you are installing the SD and FI modules and you wish to pay your salespeople bonuses through the R/3 system, you may be required to implement portions of HR as well.* [page 67]

    Hendrickson US 5,933,646 teaches software modules to be installed or removed, but these configurations are managed locally on the machine.  Hendricks mentions a "server" [col 6 lines 44+], but that is believed to be directed to locally serving/detecting changes in the Operating System and updating the local configuration database accordingly with any changes in the installation configurations.  No configuration of enabling or disabling software modules is believed to be achieved over a network (Web or otherwise) in Hendrickson.

    Any comments considered necessary by PATENT OWNER regarding the above statement must be submitted promptly to avoid processing delays.  Such submission by

Application/Control Number: 90/010,961                                   Page 31
Art Unit: 3992

the patent owner should be labeled: "Comments on Statement of Reasons for

Patentability and/or Confirmation" and will be placed in the reexamination file.


### *Conclusion*

In order to ensure full consideration of any amendments, affidavits or

declarations, or other documents as evidence of patentability, such documents must be

submitted in response to this Office action.  Submissions after the next Office action,

which is intended to be a final action, will be governed by the requirements of 37

CFR 1.116, after final rejection and 37 CFR 41.33 after appeal, which will be strictly

enforced.

Extensions of time under 37 CFR 1.136(a) will not be permitted in these

proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and

not to parties in a reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that

reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)).

Extension of time in *ex parte* reexamination proceedings are provided for in 37 CFR

1.550(c).

The patent owner is reminded of the continuing responsibility under 37 CFR

1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving Patent No. US 6,343,275 throughout the course of this

reexamination proceeding.  The third party requester is also reminded of the ability to

similarly apprise the Office of any such activity or proceeding throughout the course of

this reexamination proceeding.  See MPEP §§ 2207, 2282 and 2286.

Application/Control Number: 90/010,961                                    Page 32

Art Unit: 3992

**All** correspondence relating to this ex parte reexamination proceeding should be

directed:

By Mail to:      Mail Stop *Ex Parte* Reexam
                 Central Reexamination Unit
                 Commissioner for Patents
                 United States Patent & Trademark Office
                 P.O. Box 1450
                 Alexandria, VA 22313-1450

By FAX to:       (571) 273-9900
                 Central Reexamination Unit

By hand:         Customer Service Window
                 Randolph Building
                 401 Dulany Street
                 Alexandria, VA 22314

Any inquiry concerning this communication should be directed to **the Central**

**Reexamination Unit** at telephone number **517-272-7705.**

/Jeffrey D. Carlson/

Primary Examiner, Art Unit 3992

Conferees:

/Sam  Rimell/

Primary Examiner, Art Unit 3992