UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| BIG BABOON, INC., | ) | CV 09-1198 SVW (SSx) |
| | ) | |
| Plaintiff, | ) | ORDER DENYING DEFENDANTS' |
| | ) | MOTION FOR SUMMARY JUDGMENT OF |
| v. | ) | INVALIDITY BASED ON LACK OF |
| | ) | PATENTABLE SUBJECT MATTER |
| DELL, INC., et al. | ) | [157], AND GRANTING PLAINTIFF'S |
| | ) | MOTION TO STAY PENDING |
| Defendants. | ) | REEXAMINATION [275] |
| | ) | |
| | ) | JS6 |

**I.    INTRODUCTION**

Plaintiff has sued a variety of Defendants for infringing two of Plaintiff's patents: U.S. Patent No. 6,115,690 ("the '690 patent") and U.S. Patent No. 6,343,275 ("the '275 patent").  Defendants have jointly brought this Motion for Summary Judgment to determine whether some claims of the '690 and '275 patents are invalid for lack of patentable subject matter under 35 U.S.C. § 101.  Plaintiff has also filed a motion to stay the case pending reexamination of the claims at issue by the United States Patent and Trademark Office ("USPTO").  The Court adresses each Motion in turn.

\\\

## II. BACKGROUND

### A. General Background of the '690 and '275 Patents

Defendants have challenged a selection fourteen claims contained in Plaintiff's patent. (Pl.'s Resp. to SUF, ¶ 2.)

The basic gist of Plaintiff's patent is captured in the Patent Officer Examiner's Notice of Allowability. The Examiner describes patent '690 as covering:

> Business-to-business web commerce between a first business acting as a supplier and a second business acting as a purchaser, using a computer net including a relational database server providing for real-time synchronized data update.

(Pl.'s Ex. C: '690 Patent File History, Notice of Allowability, June 14, 1999, at 2-3).

As Plaintiff explains it, "the patents describe a novel invention (conceived in 1996) in which web servers use specially programmed computer databases to create a virtual company. The patents describe a single database schema, operating in real time. This database schema unites the computer servers of traditionally separate business sectors, including those of separate businesses (referred to as 'domains' in the patent), thereby creating a useful invention that avoids the paper, delay and inventory requirements of the 20th century." (Pl.'s Opp. at 2.) The patents provide for a unified, continuously-updating, real-time database that processes business transactions and tracks the status of those transactions. Any internet-connected computer may access this database, provided that the user of the computer is authorized to do so.

\\

\\\

**B.   Claim Construction For the Present Motion**

For purposes of the present motion, Defendants have adopted Plaintiff's preferred constructions. (Defs.' Motion at 4 n.7.)[1] The Court will follow suit and construe Plaintiff's claims in the light most favorable to Plaintiff. See CyberSource Corp. v. Retail Decisions, Inc., 620 F. Supp. 2d 1068, 1073 (N.D. Cal. 2009) (construing plaintiff's claims in a light most favorable to plaintiff on a summary judgment motion for lack of patentable subject matter). These constructions are not binding on the parties or the Court for purposes of future proceedings. Compare Fed. R. Civ. P. 56(b) ("A party against whom relief is sought may move at any time, with or without supporting affidavits, for summary judgment on all or part of the claim.") with Fed R. Civ. P. 56(d)(1) (providing special procedure for summary judgment that is ancillary to Rule 56(b)-(c), allowing court to "determine what material facts are not genuinely at issue," with the effect that "[t]he facts so specified [as not being in issue] must be treated as established in the action."); see also C.A. Wright, A. R. Miller, & M.K. Kane, 10B Federal Practice & Procedure § 2737 (2009) (explaining purpose and effect of Rule 56(d), and distinguishing Rule 56(d) from Rule 56(b)).

The Court agrees with Procter v. Sagamore Big Game Club, 265 F.2d 196, 199 (3d Cir. 1959), cert. denied 361 U.S. 831 (1959), that a court may consider a motion for summary judgment where the moving party is

---

[1] Plaintiff contends that Defendants may not adopt Plaintiff's views for purposes of this Motion, but must stipulate to an agreed-upon interpretation that will bind the parties for the remainder of the action. Plaintiff's authorities for this proposition are inapposite. See Laitram Corp. v. Cambridge Wire Cloth Co., 863 F.2d 855 (Fed. Cir. 1988); W.L. Gore & Associates, Inc. v. Garlock, Inc., 842 F.2d 1275 (Fed. Cir. 1988).

"willing to accept as true for the purpose of testing [the] motion for summary judgment all of the factual statements contained in [the opposing party's] statements of position."  These factual statements do not bind the Court or the parties outside of the context of this particular Motion.  This unusual procedure is justified in summary judgment proceedings because the Court is not required to "resolve disputed questions of fact" -- it need only determine whether, as a matter of law, "genuine issues of material fact exist."  Id. at 198. If there are no such genuine issues when viewing the evidence in the light most favorable to the nonmoving party, summary judgment is proper.  See Fed. R. Civ. P. 56(c).

The entire purpose of a Rule 56 motion "is one of judicial economy to save the time and expense of a full trial when it is unnecessary." Exxon Corp. v. Ntl. Foodline Corp., 579 F.2d 1244, 1246 (C.C.P.A. 1978).  Summary judgment is appropriate in cases where "more evidence than is already available in connection with this motion could not be reasonably expected to change the result herein." Id.  Thus, in the present context it appears that summary judgment is proper if there is no genuine factual issue as to whether the patents, viewed in the light most favorable to the nonmoving party, involve patentable subject matter as a matter of law.  If the claims potentially involve patentable subject matter, the court should then proceed to definitively construe the patent claims in accordance with Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996), and Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

Notably, the Federal Circuit has approved of this procedure in similar circumstances.  Applied Medical Resouces Corp. v. U.S. Surgical

4

Corp., 448 F.3d 1324, 1330, 1332 (Fed. Cir. 2006) ("Since the district court adopted a claim construction for purposes of the summary judgment motion, we will adopt that same construction for purposes of this appeal.")

**III. CLAIMS AT ISSUE**

At the risk of being tedious, it is helpful to set out the verbatim text of each claim at issue as well as identify Plaintiff's construction of the text.[2]  (Defs.' SUF, ¶¶ 3-17.)

**A.    Claim 36 of the '690 Patent**

A method of integrating business automation across multiple business domains and automatically reflecting automated business activities of one business domain within another business domain, the method comprising the steps of:
[A]  providing a Web-enabled, client/server relational database management system[3]

---

[2] The Court notes that one of the great frustrations of analyzing patent-related caselaw is that courts sometimes fail to set out the specific patent claims at issue.

The Court notes that, to the extent that it omits or mistypes any of Plaintiff's preferred constructions, it is largely because Plaintiff unhelpfully buried these constructions in nearly 60 pages of repetitive and partially impermissible legal argument.  The Court refuses to consider those arguments, and SUSTAINS Defendants' Objections to Plaintiff's Statement of Uncontroverted Facts and Conclusions of Law to the extent that Plaintiff's filing includes legal argument beyond that contained in Plaintiff's Opposition to Defendants' Joint Motion for Summary Judgment of Invalidity Based on Lack of Patentable Subject Matter.  (See Defendants' Objections to Plaintiff's Statement of Uncontroverted Facts and Conclusions of Law, docket no. 175.)

[3] Plaintiff construes this clause to mean "automated business-to-business web commerce system using an integrated database management system (DBMS) that is either directly accessible from the Web or provided with a Web front-end and including information belonging to different business domains, i.e., functional areas of the business operations."  (Pl.'s SUF, ¶ 47.)  Defendants respond by pointing to dictionary definitions of "database," including "A structured collection of data held in computer storage; esp. one that incorporates software to make it accessible in a variety of ways."

storing a database described by a single database schema including files belonging to each of a first business domain dealing with products and a second business domain dealing with payments; and

[B] a user making modifications to a record within a file belonging to the first business domain, the database management system in response thereto reflecting said modifications within files belonging to the second business domain.

**B.   Claim 43 of the '690 Patent**

A method of business-to-business Web commerce between a first business acting as supplier and a second business acting as purchaser, using a computer net including a relational database server,[4] the method comprising the steps of:

[A]   storing user privileges for a plurality of user authorized by the purchaser to act on its behalf;

[B]   authenticating and determining a privilege level of a user;

[C]   the user entering product parameters;

[D]   identifying products in accordance with the product parameters and displaying product information for the products;

[E]   the user selecting at least one product from the displayed product information and requesting a price quote for the product[5];

---

(Defs.' Ex. B: <u>Oxford English Dictionary</u> (2d ed. 1989), at 7.)  Also, "database management system" is defined as "a software package that provides all the functions required for database management," with "database management" defined as "the organization and manipulation of data in a database."  (<u>Id</u>.)

[4] Plaintiff construes this sentence to mean "automated business-to-business web commerce system using an integrated database management system (DBMS) that is either directly accessible from the Web or provided with a Web front-end and includes information belonging to different business domains, i.e., functional areas of the business operations."  (Pl.'s SUF, ¶ 60.)

[5] Plaintiff construes "price quote for the product" as "the digital representation, within the database management system, of a traditional price quote form used in the sale of products."  (Pl.'s SUF, ¶ 62.)

[F]   producing and displaying a price quote
      for the product, the price quote
      including a quote number; and
[G]   storing the price quote within the
      database for future reference.

## C.   Claim 50 of the '690 Patent

A method of business-to-business Web commerce
between a first business acting as supplier and a
second business acting as purchaser, using a
computer net including a relational database
server,[6] the method providing for merchandise
returns, comprising the steps of:
[A]   storing in the database a record for each
      item sold;
[B]   authenticating a user;
[C]   using a flexible product identification
      procedure, the user entering information
      identifying at least one item of
      merchandise to be returned for which a
      record is stored in the database;
[D]   using the record stored in the database,
      creating a return record and notifying a
      representative authorized by the supplier
      to approve returns;
[E]   approving the return and assigning a
      Return Merchandise Authorization number
      to the return record[7]; and
[F]   communicating to the user the Return
      Merchandise Authorization number.

## D.   Claim 54 of the '690 Patent

In a system for business-to-business Web
commerce system between a first business acting as
supplier and a second business acting as purchaser,
using a computer net including a relational

---

[6] Plaintiff construes this sentence to mean "automated business-to-
business web commerce system using an integrated database management
system (DBMS) that is either directly accessible from the Web or
provided with a Web front-end and includes information belonging to
different business domains, i.e., functional areas of the business
operations."  (Pl.'s SUF, ¶¶ 60, 70-71.)

[7] Plaintiff construes "return record" to mean "the digital
representation, within the database management system, of a product
return request."  (Pl.'s SUF, ¶ 73.)

database server,[8] a method of tracking financial information on a real-time basis and automatically generating a general ledger of accounts,[9] the method comprising the steps of:

[A]   automatically posting transactions by making corresponding general ledger entries continuously or at programmed intervals; and

[B]   automatically posting adjusting entries when records pertaining to transactions that have already been posted are modified.

### E.   Claim 74 of the '690 Patent

A method of handling sales returns over a global computer network, comprising the steps of:

[A]   receiving a Return Merchandise Authorization request via a global computer network, the request specifying return type;

[B]   evaluating the request based on a plurality of stored criteria in accordance with the return type; and

[C]   if the applicable criteria are met, automatically assigning, and communicating to a user via the global computer network,[10] a return authorization number.

---

[8] Plaintiff construes this sentence to mean "automated business-to-business web commerce system using an integrated database management system (DBMS) that is either directly accessible from the Web or provided with a Web front-end and includes information belonging to different business domains, i.e., functional areas of the business operations."  (Pl.'s SUF, ¶ 80.)

[9] Plaintiff construes "general ledger of accounts" to mean "the digital representation, within the database management system, of a financial transaction ledger."  (Pl.'s SUF, ¶ 82.)

[10] Plaintiff construes the phrase "automatically assigning, and communicating to a user via the global computer network," as meaning "the assignment of an authorization identifier to the digital representation of return request [sic (grammar)] in the database management system and communication, via the Internet, of the authorization approval and of the authorization identifier."  (Pl.'s SUF, ¶ 89.)

**F.    Claim 75 of the '690 Patent**[11]

    In a business-to-business automated Web commerce system,[12] a method of specifying complex installation instruction[13] regarding a plurality of purchase items using a graphical user interface, the method comprising the steps of:
    [A]   selecting a first primary item;
    [B]   selecting one or more secondary items to be installed with the first primary item;
    [C]   selecting a second primary item; and
    [D]   selecting one or more secondary items to be installed with said second primary item.

**G.    Claim 76 of the '690 Patent**

    The method of claim 75 wherein selecting said items occurs via the Web.

**H.    Claim 77 of the '690 Patent**

    An automated business process for product sales that uses a Web-enabled relational database management system[14] to automate an integrated supply chain including a seller and a plurality of vendors, the process comprising the steps of:

---

[11] Defendants are not moving for summary judgment as to Claim 75 of the '690 patent, but this claim is included because Claim 76 of the '690 is dependent upon it.

[12] Plaintiff construes this clause as "automated business-to-business web commerce system using an integrated database management system (DBMS) that is either directly accessible from the Web or provided with a Web front-end and includes information belonging to different business domains, i.e., functional areas of the business operations." (Pl.'s SUF, ¶ 96.)

[13] Plaintiff construes "specifying complex installation instruction" as meaning "the specification in the digital representation of the order form in the database management system of custom handling instructions for the order." (Pl.'s SUF, ¶ 98.)

[14] Plaintiff construes this phrase as "automated business-to-business web commerce system using an integrated database management system (DBMS) that is either directly accessible from the Web or provided with a Web front-end and includes information belonging to different business domains, i.e., functional areas of the business operations." (Pl.'s SUF, ¶ 105.)

[A]   a seller placing vendor orders and
      entering order information into the
      database, the orders being communicated
      to the vendors through a global computer
      network;
[B]   the seller receiving the orders in whole
      or in part and entering receiving
      information into the database;
[C]   the vendors accessing receiving
      information through the global computer
      network to ensure prompt receipt of
      orders;
[D]   the seller requesting return of selected
      order items; and
[E]   the vendors accessing return information[15]
      through the global computer network and
      in response thereto communicating return
      merchandise authorization numbers to the
      seller through the global computer
      network.

## I.   Claim 81 of the '690 Patent

A method of order fulfillment, comprising the
steps of:
[A]   placing an order[16] for a part;
[B]   entering the order within a Web-enabled
      relational database[17] system;
[C]   tracking each significant event in the
      order fulfillment process within the
      relational database system; and
[D]   communicating the order status to at
      least one party via the Web.

\\

---

[15] Plaintiff construes "return information" as "the digital
representation, within the database management system, of a product
return request."  (Pl.'s SUF, ¶ 107.)

[16] Plaintiff construes "an order" as "the digital representation,
within the database management system, of an order form."  (Pl.'s
SUF, ¶ 116.)

[17] Plaintiff construes "Web-enabled relational database" as "automated
business-to-business web commerce system using an integrated database
management system (DBMS) that is either directly accessible from the
Web or provided with a Web front-end and includes information
belonging to different business domains, i.e., functional areas of
the business operations."  (Pl.'s SUF, ¶ 114.)

**J.    Claim 1 of the '275 Patent**

A method of processing customer service requests relating to a product, including returns, over the Web, comprising:
[A]  defining an automated workflow process for customer service requests, including returns, that uses a database and a Web-enabled database management system[18];
[B]  a customer making a purchase from a merchant; and
[C]  the customer, via the Web in a self-help manner, causing a customer-service/return record[19] to be created in the database, to be processed by the merchant wherein the customer-service/return record created is related to a pre-existing database record and wherein, for at least some customer-service/return records, the automated workflow process reverses a previously executed workflow process.

**K.    Claim 4 of the '275 Patent**

In a Web-based business-to-business electronic commerce system including a database and a Web server,[20] a method of transaction processing, comprising the step of:
[A]  obtaining from multiple parties via the Web demand information specifying an item to be the subject of a transaction; and

---

[18] Plaintiff construes "Web-enabled database management system" as "automated business-to-business web commerce system using an integrated database management system (DBMS) that is either directly accessible from the Web or provided with a Web front-end and includes information belonging to different business domains, i.e., functional areas of the business operations."  (Pl.'s SUF, ¶ 123.)

[19] Plaintiff construes "customer-service/return record" as "the digital representation, within the database management system, of a customer return request."  (Pl.'s SUF, ¶ 127.)

[20] Plaintiff construes this phrase as "a computer containing sufficient software to operate an automated business-to-business web commerce system using an integrated database management system (DBMS) that is either directly accessible from the Web or provided with a Web front-end and includes information belonging to different business domains, i.e., functional areas of the business operations."  (Pl.'s SUF, ¶ 137.)

11

```
                    [B]   within said database, organizing
                          transaction information into self-
                          contained workflow units having a
                          predetermined format and each including
                          demand information for a particular
                          party, the predetermined format defining
                          a command demand document[21] enabling
                          demand information to be capsuled for a
                          range of differentiated business
                          transactions of different complexity.
```

**L.    Claim 11 of the '275 Patent**

```
          A method of organizing and displaying
    information stored within a database[22] to facilitate
    a user task, comprising the steps of:
                    [A]   specifying a classification scheme,
                          consistent with common business practice
                          and terminology;
                    [B]   applying an algorithm whereby items are
                          classified, marked and displayed
                          according to classification for
                          preforming a particular business
                          function; and
                    [C]   within a single display screen,
                          displaying the categorized items along
                          with one or more user interface controls
                          for taking action with respect to one or
                          more items.
```

**M.    Claim 13 of the '275 Patent**

```
          A method of establishing an end-to-end
    business-to-business commerce system in which
    product items are sold, using a Web-enabled
    relational database management system running on a
```

---

[21] Plaintiff construes "command demand document" as "a digital representation, within the database management system, of the processing for a particular order related user request."  (Pl.'s SUF, ¶ 139.)

[22] Plaintiff construes "database" as "automated business-to-business web commerce system using an integrated database management system (DBMS) that is either directly accessible from the Web or provided with a Web front-end and includes information belonging to different business domains, i.e., functional areas of the business operations." (Pl.'s SUF, ¶ 146.)

server platform,[23] the method comprising the steps of:

[A]  providing within a single automated system data and methods spanning multiple business functions, the data being stored in accordance with a single database scheme;

[B]  providing a user interface that allows open navigation by a user between information pertaining to different business domains, and, for each of multiple business functions, displaying within an integrated decision making environment complete information required to perform that business function; and

[C]  dynamically defining multiple virtual business departments by, for each of multiple groups of people, assigning substantially similar access privileges to each person within the group, wherein access privileges of different groups are substantially different.

## N.  Claim 16 of the '275 Patent

A system for end-to-end, business-to-business electronic commerce, comprising:

[A]  a server platform running a Web-enabled relational database management system[24];

[B]  stored in the database, an item table comprising item records, each item record containing business domain-specific fields pertaining to a plurality of the

---

[23] Plaintiff construes "Web-enabled relational database management system running on a server platform" as "a computer containing sufficient software to operate an automated business-to-business web commerce system using an integrated database management system (DBMS) that is either directly accessible from the Web or provided with a Web front-end and includes information belonging to different business domains, i.e., functional areas of the business operations." (Pl.'s SUF, ¶ 153.)

[24] Plaintiff construes this clause as meaning "a computer containing sufficient software to operate an automated business-to-business web commerce system using an integrated database management system (DBMS) that is either directly accessible from the Web or provided with a Web front-end and includes information belonging to different business domains, i.e., functional areas of the business operations." (Pl.'s SUF, ¶ 161.)

following business domains: products,
payments, performance and personnel;

[C] software for reading item records,
organizing selected information from the
item records, and presenting the selected
information as domain-specific displays;

[D] whereby, once item information has been
input and committed, it is immediately
available for viewing by a multiplicity
of information workers, different
information workers having responsibility
for different ones of said domains.

**O.   Claim 18 of the '275 Patent**

In an automated end-to-end, business-to-
business transaction processing system including a
database,[25] a method of user/system interaction for
accomplishing a business task stemming from an
order, whereby business decisions normally made by
an experienced human decision maker by gathering
information across multiple business domains and
applying human expertise to the gathered
information are computer automated/assisted, the
method comprising the steps of:

[A] integrating within a single database
business information spanning multiple
business domains;

[B] formalizing a decision-making algorithm
that uses information spanning multiple
business domains;

[C] responsive to a user action, triggering
the decision-making algorithm and
performing at least one of the following:
1) presenting to the user results of the
decision-making algorithm; and 2) making
a database entry enabling a subsequent
business process to be performed.

\\

\\

\\\

---

[25] Plaintiff construes this clause as "an automated business-to-
business web commerce system using an integrated database management
system (DBMS) that is either directly accessible from the Web or
provided with a Web front-end and includes information belonging to
different business domains, i.e., functional areas of the business
operations." (Pl.'s SUF, ¶ 168.)

**IV.   DISCUSSION**

    **A.   Patentable Subject Matter Under 35 U.S.C. § 101**

The question of whether a patent claims patentable subject matter under § 101 is purely a question of law.  Section 101 defines the subject matter that may be patented under the Patent Act:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 101.

> The term 'process' means process, art, or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material.

35 U.S.C. § 100(b).

"The section 101 patent-eligibility inquiry is only a threshold test."  <u>Research Corp. Technologies, Inc. v. Microsoft Corp.</u>, 627 F.3d 859, 868 (Fed. Cir. 2010).  As the <u>Research Corp. Technologies</u> court emphasized, after approving broad categories of subject matter, § 101 itself directs primary attention to the more narrow requirements of Title 35 (for example, novelty - § 102 and nonobviousness - § 103).  <u>Id.</u>

The Supreme Court in <u>Bilski v. Kappos</u>, 130 S. Ct. 3218, 3226 (2010), stressed "that courts should not read into the patent laws limitations and conditions which the legislature has not expressed."  <u>Id.</u> (quoting <u>Diamond v. Diehr</u>, 450 U.S. 175, 182 (1981))(internal quotations omitted).  The Supreme Court stated that the only exceptions from the ordinary meaning of the Patent Act's definition of patentable

1   subject matter are the exceptions for laws of nature, physical

2   phenomena, and abstract ideas.  Id.

3        Applying this general statutory interpretation framework, the

4   Court concluded that the Federal Circuit's adoption of the machine-or-

5   transformation ("MOT") test as the sole test for patentable subject

6   matter strayed too far from the ordinary meaning of the term "process"

7   in § 101.[26]  Id.  However, the Court did acknowledge that the MOT test

8   "is a useful and important clue, an investigative tool, for determining

9   whether some claimed inventions are processes under § 101."  Id. at

10  3227.  The Court went further in explaining its reasoning in a

11  plurality opinion, in which Justice Scalia did not join.  In the

12  plurality opinion, the Court stated:

13          The machine-or-transformation test may well provide
            a sufficient basis for evaluating processes similar
14          to those in the Industrial Age-for example,
            inventions grounded in a physical or other tangible
15          form. But there are reasons to doubt whether the
            test should be the sole criterion for determining
16          the patentability of inventions in the Information
            Age. As numerous amicus briefs argue, the
17          machine-or-transformation test would create
            uncertainty as to the patentability of software,
18          advanced diagnostic medicine techniques, and
            inventions based on linear programming, data
19          compression, and the manipulation of digital
            signals.
20

21     Id. at 3227.

22     However, the plurality opinion then clarified that it did not hold

23  that "Information Age" technologies, generally, deserved patent

24  protection:

25  ─────────────────────
    [26] In In re Bilski, 545 F.3d 943 (Fed. Cir. 2008) (en banc), the
26  Federal Circuit held that the final two-part test for patentable
    subject matter is whether the claimed invention "is tied to a
27  particular machine or apparatus" or whether it "transforms a
    particular article into a different state or thing."  545 F.3d at 954
28  overruled by Bilski v. Kappos, 130 S. Ct. 3218 (2010).

> It is important to emphasize that the Court today
> is not commenting on the patentability of any
> particular invention, let alone holding that any of
> the above-mentioned technologies from the
> Information Age should or should not receive patent
> protection. This Age puts the possibility of
> innovation in the hands of more people and raises
> new difficulties for the patent law. With ever more
> people trying to innovate and thus seeking patent
> protections for their inventions, the patent law
> faces a great challenge in striking the balance
> between protecting inventors and not granting
> monopolies over procedures that others would
> discover by independent, creative application of
> general principles. Nothing in this opinion should
> be read to take a position on where that balance
> ought to be struck.

Id. at 3228.

Addressing the question of whether there should be a categorical exclusion of "business methods" from the word "process" in § 101, the Court found that such a categorical exclusion would be unsupported by the ordinary meaning of "process" and other portions of Title 35. Id. Specifically, the Court looked to 35 U.S.C. § 273(b)(1), where the statute allows an infringement defense of prior use for "a method of doing or conducting business." Id. (quoting § 273(a)(3)) (internal quotations omitted). The Court reasoned that "[a] conclusion that business methods are not patentable in any circumstances would render § 273 meaningless." Id.

In a plurality opinion in which Justice Scalia did not join, the plurality expressed the need for "a limiting principle" to apply to business method patents. Id. at 3229. However, the plurality acknowledged that "the Patent Act leaves open the possibility that there are at least some processes that can be fairly described as business methods that are within patentable subject matter under § 101." Id. The plurality went on to state that "even if a particular

17

business method [is a] 'process' . . . any claimed invention must be novel, § 102, nonobvious, § 103, and fully and particularly described, § 112." Id.; see also Research Corp. Technologies, 627 F.3d at 868 ("[S]ection 101 eligibility should not become a substitute for a patentability analysis related to prior art, adequate disclosure, or the other conditions and requirements of Title 35. In other words, section 101 does not permit a court to reject subject matter categorically because it finds that a claim is not worthy of a patent.").

Turning to the applicants' claims in Bilski,[27] the Court looked to Diehr, 450 U.S. 175, Parker v. Flook, 437 U.S. 584 (1978), and Gottschalk v. Benson, 409 U.S. 63 (1972) for guidance. The Court found that the applicants' claims were similar to the unpatentable algorithms in Benson and Flook, but unlike the patentable rubber-curing process in Diehr. The Court found that the applicants' claims were "broad examples of how hedging can be used in commodities and energy markets." Id. at 32321. Applying Benson and Flook, the Court held that "[a]llowing petitioners to patent risk hedging would pre-empt use of this approach in all fields, and would effectively grant a monopoly

----

[27] Claim 1 in the applicants' patent claimed the following steps:
    (a) initiating a series of transactions between said commodity provider and consumers of said commodity wherein said consumers purchase said commodity at a fixed rate based upon historical averages, said fixed rate corresponding to a risk position of said consumers;
    (b) identifying market participants for said commodity having a counter-risk position to said consumers; and
    (c) initiating a series of transactions between said commodity provider and said market participants at a second fixed rate such that said series of market participant transactions balances the risk position of said series of consumer transactions.

over an abstract idea." <u>Id.</u>  A discussion of <u>Benson</u>, <u>Flook</u>, and <u>Diehr</u>
is instructive in understanding the Court's reasoning.

In <u>Benson</u>, the Court considered whether a patent application for a
method to convert binary coded decimal numerals into pure binary code
using a general-purpose digital computer was a patentable "process"
under § 101.  <u>Benson</u>, 409 U.S. at 64.  The Court held that "[t]he
mathematical formula involved here has no substantial practical
application except in connection with a digital computer, which means
that . . . the patent would wholly pre-empt the mathematical formula
and in practical effect would be a patent on the algorithm it-self."
<u>Id.</u> at 71-72.

In <u>Flook</u>, the Court considered whether a patent procedure for
automatically controlling catalytic conversion processes, comprising
the measurement of process variables (such as temperature) and
calculating an alarm limit using a disclosed formula.  <u>Flook</u>, 437 U.S.
at 585-86.  Unlike in <u>Benson</u>, the claims did not pre-empt the entire
use of the formula, but limited it to the control of the catalytic
conversion process in the petrochemical and oil-refining industries.
<u>Id.</u> at 589-90.  The Court reasoned that such insignificant "post-
solution" limits could not "transform an unpatentable principle into a
patentable process."  <u>Id.</u> at 590.  As summarized in <u>Bilski</u>, "<u>Flook</u>
stands for the proposition that the prohibition against patenting
abstract ideas cannot be circumvented by attempting to limit the use of
the formula to a particular technological environment or adding
insignificant postsolution activity."  <u>Bilski</u>, 130 S. Ct. at 3230.

Finally, in <u>Diehr</u>, an applicant claimed a previously unknown
method of curing synthetic rubber using a mathematical formula. <u>Diehr</u>,

19

450 U.S. at 177.   The Court held that "an application of a law of
nature or mathematical formula to a known structure or process may well
be deserving of patent protection." Id. at 187.   The Court concluded
that the patent claim fell within patentable subject matter because it
did not "patent a mathematical formula, but rather an industrial
process for the molding of rubber products." Id. at 192-93.

In sum, after Bilski, this Court is left to compare the present
claims with those considered in the key precedents of Diehr, Flook,
Benson, and Bilski itself.   Further, though the MOT test is still a
useful tool, it is neither sufficient nor necessary to determine
whether claims cover "abstract ideas."

### (1)   Analysis

In this case, as construed by Plaintiff, the present invention is
a method for business-to-business Web commerce between businesses and
within businesses involving an automated business-to-business web
commerce system using an integrated database management system (DBMS).
This "process" clearly appears to meet the broad language of § 101 and
§ 100, however, the Court must determine whether the present invention
falls in the "abstract idea" exception.

"Abstractness" has not yet been defined.   Research Corp.
Technologies, 627 F.3d at 868.   The Federal Circuit, in an opinion
after Bilski, offered some guidance:

> [T]his court also will not presume to define
> "abstract" beyond the recognition that this
> disqualifying characteristic **should exhibit
> itself so manifestly** as to override the broad
> statutory categories of eligible subject
> matter and the statutory context that directs
> primary attention on the patentability
> criteria of the rest of the Patent Act.
>
> Id. (emphasis added).

In this case, using Plaintiff's proposed construction, the Court cannot find that the claims at issue, each incorporating the specially programmed[28] DBMS as a claim element, exhibit abstractness so manifestly as to override the overall inclusiveness of § 101 emphasized by the Research Corp. Technologies court.

Defendants argue that under Bilski and Flook, the claims at issue superficially limit an abstract idea with an insignificant "extra-solution" activity such as "conventional" data gathering, storage, and reporting.  Defendants argue that "Plaintiff does not identify any element of its **claims** as a novel component or anything other than token 'conventional,' 'obvious' and 'well known' additions." Doc. No. 305 at 2 (citing Bilski v. Kappos, 2010 WL 2555192 at *11, *12). (emphasis in original).  Defendants point to portions of the claims at issue and contend these limitations are abstract.  See Doc. No. 305 at 4-5.  However, under this piecemeal approach, virtually any claim can be labeled an "abstract idea."  As emphasized in Diehr and acknowledged in Bilski, the abstractness inquiry requires the court "to consider the invention as a whole, rather than 'dissect[ing the claims into old and new elements and then . . . ignor[ing] the presence of the old elements

---

[28] Defendants also contend that the DBMS is not specially programmed because the patents at issue only provide "logical" schema in various figures.  Defendants take issue with the fact that the patents "list[] no computer programming code, of any kind," suggesting that the logic depicted is merely "an abstract representation of generic business data like an organization chart or bookkeeping form."  Doc. No. 305 at 6.  However, logic is the basis of all programming.  Whether or not the logic is in the form of a specific programming language is not relevant to the abstractness inquiry.  In any case, because of the unique procedural posture of this case and as the Defendants themselves suggested at the outset, the Court interprets the claims at issue in favor of the Plaintiff.

in the analysis.'" <u>Bilski</u>, 130 S. Ct. at 3230 (quoting <u>Diehr</u> 450 U.S.
at 188).

Furthermore, in analogizing to <u>Benson</u> and arguing that the claims
at issue add only "well-known" or "obvious" elements, Defendants ignore
the clear direction of <u>Bilski</u> and § 101 itself to reserve issues of
novelty and nonobviousness for the relevant portions of the Patent Act.
The <u>Bilski</u> opinion highlighted the fact that § 101 was only a threshold
inquiry, separate from the requirements of § 102, § 103, and § 112.
<u>Bilski</u>, 130 S. Ct. at 3229.  Similarly, the <u>Bilski</u> Court reasoned that
§ 101 should not be construed so as to render other portions of the
Patent Act meaningless.  <u>Id.</u> at 3228.  Here, this Court declines to
embark on an inquiry into the present claims' novelty and
nonobviousness.  To do so would allow the § 101 inquiry to swallow the
more narrow requirements of the Patent Act.

Even looking beyond these flaws in Defendants' arguments, the
assertion that the claims at issue attempt to limit an abstract idea
through insignificant post-solution activity is unavailing.  The recent
district court decision in <u>CyberSource Corp. v. Retail Decisions, Inc.</u>,
620 F. Supp. 2d 1068 (N.D. Cal. 2009), offers a useful counterpoint for
evaluating the present case under <u>Flook</u>.  In that case, the court
determined that the process of detecting credit card fraud over the
internet did not include meaningful limitations on the scope of the
patent.  The recitation of "over the internet" was deemed to be
insignificant extra-solution activity, because the claimed method of
detecting credit card fraud "can be carried out in contexts other than
the internet." <u>Id.</u> at 1077.  The court noted that "an unpatentable
mental process for collecting data and weighing values does not become

patentable by tossing in references to internet commerce." _Id._   Thus,
the court concluded that "the use of the internet does not impose
meaningful limits on the scope of the claims," because it "preempt[ed]
the use of fundamental mental processes across an extraordinarily large
and important segment of the commercial system." _Id._  "The instant
claims broadly preempt the fundamental mental process of fraud
detection using associations between credit card numbers.  A limitation
to 'only' the vast area of online credit card transactions is not
meaningful."  _Id._ at 1078.

     Whereas the _CyberSource_ fraud-detection program merely invoked the
"internet" as an extra-solution activity, in the present case, the use
of the specially programmed, web-enabled DBMS is central to each and
every claim at issue.  The claims do not merely invoke the "internet"
as an postsolution limitation; instead, the claims rely upon a
constantly-updating database, specially programmed, that is accessible
from any internet-enabled computer so that distant businesses and
offices may receive, process, track, and input business activity
instantaneously.  The DBMS element in each of these claims supports the
view that the claims do not merely incorporate it as insignificant
postsolution activity under _Flook_.

          **(2)  Conclusion**

     Under the unique procedural posture of this case and adopting
Plaintiff's claim construction solely for the purposes of this Motion,
the Court holds that the claims at issue cover patentable subject
matter under § 101.  It is important to emphasize the narrow reach of
the present Order.  Plaintiff's patent claims, construed in Plaintiff's
favor, recite patentable subject matter within 35 U.S.C. § 101.  It is

possible that these claims, when definitively construed, will no longer

satisfy § 101.  It is also possible that these claims will not satisfy

the other statutory requirements of patentability.

Those caveats aside, and in light of the foregoing discussion, the

Court DENIES Defendants' Motion for Summary Judgment of Invalidity

Based on Lack of Patentable Subject Matter.

### B.   Stay Pending Reexamination

#### (1)   Background

Plaintiff has moved to stay the litigation pending reexamination

of the claims at issue at the USPTO.  A third party has requested that

the USPTO reexamine the validity of the two patents at issue in the

present litigation.[29]  Four of the nine remaining Defendants - Intel,

Amerisource, Dell, and UPS - do not oppose Plaintiff's Motion to Stay

Proceedings.

#### (2)   Analysis

The court in <u>IMAX Corp. v. In-Three, Inc.</u>, 385 F. Supp. 2d 1030,

1032 (C.D. Cal. 2005), accurately states the relevant legal standard:

> District courts have the inherent authority to stay
> proceedings pending the outcome of reexamination
> proceedings in the PTO. *Ethicon v. Quigg*, 849 F.2d
> 1422, 1426 (Fed. Cir. 1988).  Courts consider
> several factors in deciding whether to stay an
> action: (1) whether a stay will simplify the issues
> in the litigation; (2) whether discovery is
> completed and whether a trial date is set; and (3)

---

[29] Throughout its papers, Plaintiff attempts to equate Defendants with
the third party because the third party is a client of one of the
Defendants' attorneys.  However, this fact is wholly extraneous to
the substance of the current Motion.  The relevant fact is, however,
that Plaintiff did not request the reexamination, but a third party
did.  If Plaintiff had requested reexamination and then immediately
sought a stay, the Court would be more inclined to find that
Plaintiff was seeking a tactical advantage as Defendants argue.
However, this is not the case here.

whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party. *Guthy-Renker Fitness L.L.C. v. Icon Health and Fitness, Inc.*, 48 U.S.P.Q.2d 1058 (C.D. Cal. 1998). "The suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else." *Unidisco v. Schattner*, 210 U.S.P.Q. 622, 629 (D. Md.1981) (citing *Landis v. North Am. Co.*, 299 U.S. 248, 255, 57 S.Ct. 163, 81 L.Ed. 153 (1936)).

IMAX v. In-Three, 385 F. Supp. 2d at 1032.

### (a)   Simplification of Issues in Litigation

As Plaintiff explains: "The reexaminations will simplify issues as the PTO will interpret and reevaluate the claims in light of additional prior art . . . brought to the PTO's attention and take into account recent case law. The Court will thus have the benefit of the PTO's expertise on validity and claim interpretation." (Reply at 2.) This is particularly relevant in this case, where infringement of nearly two dozen independent claims is alleged and no claim construction has been completed.

### (b)   Completion of Discovery and Setting of Trial Date

Although discovery has been continuing for over one year, no trial date has been set. No claim construction has been undertaken. Furthermore, reexamination has been pending for over six months and the Court has already received notice of the first set of rejections by the examiner.

### (c)   Undue Prejudice

In this Order, the Court has resolved the only pending potentially dispositive Motion before the Court. Defendants claim that they face prejudice primarily because potential damages will continue to accrue

during reexamination.[30]   However, if the Court were to rely solely on this argument, it could never grant a stay in a case with continuing violations.   Moreover, the fact that four of the nine similarly situated Defendants do not oppose a stay after a resolution of the § 101 Motion strongly suggests that Defendants do not face undue prejudice.

### (2)   Conclusion

The Court GRANTS Plaintiff's Motion to Stay Proceedings Pending Reexamination.   The case will be placed on the Court's inactive calendar.   Plaintiff is ORDERED to notify the Court, within FIVE (5) days of a final action by the USPTO in the reexamination proceedings so it may lift the stay, if necessary.   The Court declines to exercise its discretion in tolling damages pending reexamination.

\\

\\

\\

\\

\\

\\\

---

[30] Defendants seek an Order tolling damages during reexamination.   The Court has considered these arguments, however, the Court declines to exercise its discretion in tolling damages.   Under 35 U.S.C. §§ 252, 307(b), if reexam results in some substantive change to a claim, "an infringer's liability commences only from the date the reissue patent is issued." Seattle Box Co. v. Industrial Crating & Packing, Inc., 731 F.2d 818, 827-28 (Fed. Cir. 1984).   "Thus the statute relieves those who may have infringed the original claims from liability during the period before the claims are validated." Bloom Engineering Co. v. North American Mfg. Co., 129 F.3d 1247, 1249 (Fed. Cir. 1997). Congress and the Federal Circuit have already set the policy on reexaminations.   Further, the prospect of being relieved of liability more than outweighs any prejudice faced by Defendants due to delays.

**V.    CONCLUSION**

The Court DENIES Defendant's Motion for Summary Judgment of Invalidity Based on Lack of Patentable Subject Matter.  The Court GRANTS Plaintiff's Motion to Stay Proceedings Pending Reexamination.

IT IS SO ORDERED.

DATED:____February 8, 2011____        _____

                                            STEPHEN V. WILSON

                                       UNITED STATES DISTRICT JUDGE